# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ALEXANDER JEREMY STEANHOUSE,

Defendant-Appellant.

FOR PUBLICATION
October 22, 2015
9:00 a.m.

No. 318329
Wayne Circuit Court
LC No. 11-011939-FC

Before: WILDER, P.J., and OWENS and M. J. KELLY, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of assault with intent to commit murder, MCL 750.83, and receiving and concealing stolen property under $20,000, MCL 750.535(3)(a). He was sentenced to 30 to 60 years' imprisonment for his assault with intent to commit murder conviction and one to five years' imprisonment for his receiving and concealing stolen property conviction. We affirm defendant's convictions, but remand for further proceedings consistent with this opinion.

## I

## A

Defendant and Antonin ("Anton") Valoppi were good friends and often smoked marijuana in the basement of the home that Anton shared with his parents, Rory and Suzanne Valoppi.[1] In September 2011, the Valoppis' residence was robbed. Two weeks later, defendant told Anton that he knew the individuals who had broken into the Valoppis' home and offered to retrieve the stolen items if Anton paid him. According to defendant, he discovered that Derrin Evans had committed the robbery and retrieved the items from him. Defendant partially returned the stolen property to Anton, who gave him "reward" money in return. Defendant testified that he subsequently gave a portion of the "reward" money to Evans.

---

[1] We will refer to Antonin Valoppi by his nickname, "Anton," and will refer to Rory and Suzanne Valoppi by their first names.

On October 16, 2011, defendant came to the Valoppi residence to smoke marijuana with Anton. Anton and Rory did not recall anyone except defendant entering their home. However, defendant testified at trial that he and Evans both went to Anton's home to smoke marijuana.[2] When defendant arrived, Anton and defendant went into the basement. Anton then went upstairs to retrieve his box of marijuana and returned to the basement. The next thing that Anton remembered was waking up with his throat "hanging open" and seeing defendant standing in front of him while staring at him, "wait[ing] for [him] to die." Defendant made no attempt to help Anton.

Anton ran upstairs to get help and told Rory "[t]hat his friend tried to kill him." While Rory and Suzanne were helping Anton, Rory saw defendant run up the stairs and out the side door of their home even though Rory shouted at defendant for help. Suzanne asked Anton what happened, and Anton replied, "A.J. stabbed me." In response to questions by the 911 operator, Anton indicated that A.J. Steanhouse committed the assault and provided defendant's address. Anton did not actually see who assaulted him, but he believed that defendant was the only other person in the basement when the assault occurred. Additionally, Anton believed that he was struck in the head with a wrench before his throat was slit, drawing this inference from the fact that he sustained a skull fracture and that he later found a wrench with "hair sticking out of [it]."

According to defendant, Evans was the perpetrator of the assault. When Anton, who was "past [sic] over the level of being high," went upstairs, Evans told defendant that he was going to rob and kill Anton. After Anton returned to the basement, Evans attacked him, cut his throat, grabbed some marijuana and pills, and left the residence. Defendant then rolled Anton over, at which time the knife came out of his neck, and called Anton's name, waking Anton up. Defendant testified that Anton accused defendant of stabbing him, and defendant excitedly repeated that he was not the one who assaulted Anton. Defendant then ran upstairs and left the residence because he was "under the influence and high" and shocked and hurt that Anton would believe that defendant "would do something like this to him."

After leaving Anton's home, defendant went to his own house and changed his clothes because there was blood on them. He also woke up his girlfriend, Katherine McIntyre, telling her that he had been at Anton's home and that Anton had been stabbed, but he did not specify the perpetrator of the assault. Defendant then left the house and stayed the night at a friend's residence. Defendant later told McIntyre that "Chips"[3] stabbed Anton.

The day after the incident, defendant turned himself in and was arrested. He maintained his innocence and implicated "Chips" as the perpetrator of the assault. When the police searched defendant's vehicle, they discovered some of the items that were reported as stolen from the Valoppi residence. Police officers also recovered defendant's clothing from his home. Forensic testing of the blood on defendant's clothing and the possible blood stain on the knife blade recovered from the scene matched Anton's DNA. Additionally, forensic testing of the knife

---

[2] Anton testified that he did not know anyone named Derrin Evans.

[3] "Chips" is Evans's nickname.

handle recovered from the scene revealed two DNA types, but only that of the major donor, i.e., Anton, could be identified; the testing could not confirm whether the DNA of the minor donor was defendant's or Evans's DNA.

B

After the incident, Evans provided two statements during separate interviews with a police detective. In his first statement, provided after the detective indicated that defendant had implicated Evans as the perpetrator of the assault, Evans stated that he was not present at the scene of the assault. Evans provided his second statement four months later while he was in custody for a separate offense. After the detective informed him again that defendant had implicated him in Anton's assault, and the detective stated that he knew that Evans was present when the crime was committed, Evans admitted that he was present in the basement of Anton's home at the time of the assault, but he claimed that defendant slit Anton's throat, after which Evans ran up the stairs and left the residence.

At a pretrial hearing, the prosecutor informed the trial court of the possibility that Evans could incriminate himself in light of his contradictory police statements and defendant's theory that Evans committed the assault. The prosecutor asked the trial court to appoint counsel for Evans and conduct a hearing before trial regarding whether Evans would exercise his privilege against self-incrimination. The trial court granted the prosecutor's request.

On the first day of the trial, before jury selection and outside the presence of the prospective jurors, Evans's appointed counsel informed the trial court that he had discussed the Fifth Amendment right against self-incrimination with Evans, and that he believed that Evans could incriminate himself if he testified given the inconsistencies between his two statements and his potential testimony that he was present at the scene of the crime. Evans's attorney stated that he had advised Evans not to testify, and that Evans had decided to invoke his Fifth Amendment privilege. Based on Evans's invocation of his Fifth Amendment privilege, the trial court ruled that Evans was an unavailable witness and did not compel Evans to testify. Subsequently, defendant moved to admit the statements that Evans made to the police pursuant to MRE 804(b)(3) and MRE 804(b)(7). The trial court ruled that Evans's statements were not admissible under either hearsay exception, finding that neither of Evans's statements was against his penal interest and that the statements lacked sufficient indicia of trustworthiness.

During trial—after McIntrye testified that defendant stated, when he came home on the night of the incident, that he was at Anton's home and that Anton was stabbed without specifying who stabbed Anton—the prosecutor introduced a brief excerpt of McIntyre's police interview. During the interview, McIntyre initially told the detective that defendant did not admit that he stabbed Anton on the night of the assault, but she later told the detective that defendant admitted that he stabbed Anton. After she left the police station, McIntyre immediately called the detective and stated that she lied when she said that defendant admitted that he stabbed Anton. At trial, McIntyre testified that she lied to the police and asserted that defendant never told her that he stabbed Anton. She explained that she made the statement during the interview because she was tired and felt threatened, pressured, not safe, and uncomfortable when the detective mentioned her children and indicated that she could get into trouble even though she was not present during the offense.

-3-

During his closing argument, the prosecutor argued, without objection, that defendant's admission to McIntyre that he stabbed Anton was substantive evidence of defendant's guilt. The trial court, also without objection, instructed the jurors that they could consider prior inconsistent statements both for impeachment purposes and as substantive evidence. Afterward, defense counsel expressly approved the instructions provided by the trial court.

Also during trial, the prosecutor made the following references to defendant's account of the criminal episode as a "lie" and a "story" during his closing argument:

> What we have here is the defendant basically, following the old axiom about if you're going to lie, tell a big lie.

> Tell one that's so shocking and enormous that people don't just immediately dismiss it as a lie, because it's so big but they have to just stand back and look at him; wait a minute, is he really telling me what I think he's telling me.

> And what you heard from the defendant about his explanation for what happened, is precisely that. It's the big lie.

> And we know that from a lot of different perspectives and for a lot of different reasons.

> One of them is the fact that he got caught up in the details of what he was saying, and it turned out there were some pretty major inconsistencies in what he was saying.

> Because when you tell the big lie, you can't always keep your little details straight.

> \* \* \*

> He has not kept his details straight in the big lie he's told you. And beyond just the details that he's gotten wrong[,] it just doesn't make sense.

During his rebuttal argument, the prosecutor stated:

> [W]hat they're left with is the defendant's big lie; that [sic] so obviously a big lie that you can't believe it.

> \* \* \*

> Now, I think you have to ask yourself how is it, and why is it, and when is it that the defendant came up with this story about Chips having done this. . . .[4]

---

4 Defense counsel objected to the prosecutor's use of the word "story" at this point.

-4-

* * *

[H]e's faced with a situation where he's got to tell you the big lie and he's got to have you believe that big lie.

The prosecutor also argued during his closing argument that defendant was the only person to come inside the home and only person in the basement except for Anton.

Defense counsel asserted during his closing argument that the prosecutor failed to present Anton's medical records and, therefore, prevented the jury from being able to perform a "fair and meaningful" evaluation of the extent of Anton's injuries. In response, the prosecutor stated the following during his rebuttal:

Now, you may have noticed I was taking a few notes while [defense counsel] was talking. So I'm going to address a few of the issues that he did.

And first on that list of issues is, I think what he mentioned, one of the first things, and he kept going back to it, was there's not enough blood here[,] he says. There's no[] medical records to show you what actually happened to Anton Valoppi.

Well it's true; I mean one thing you have to keep in mind throughout this entire process is that, as I've just said, I have the burden of proof.

The defense has no burden of proof whatsoever. They don't have to call any witnesses.

They didn't have to call his own client to the witness stand, didn't have to call any witnesses whatsoever.

As the Judge told you from the beginning of the trial[,] they could have just sat here and played tic-tac-toe.

And then just got up an argument [sic] in the end, doesn't even have to argue again.

But if they got up and argued again and just said prosecutor didn't prove his case and sat down, you would have to consider all the same instructions whether we've proven the case beyond a reasonable doubt; the defense doesn't have to do anything.

So I mean when you think about that argument about the medical records[,] though, it's true we've had the medical records for three months but so has [defense counsel].

* * *

[Defense counsel] doesn't have to show you the medical records he

-5-

received[;] he has no burden of proof.

But when he argues to you that I should have shown them to you, at least you ought to think well, if there's something important in there[, defense counsel,] you could have brought it out.

He didn't[] because all he wants to argue to you is that somehow we're being unfair to him. We didn't bring any medical records in here[;] he's had them for three (3) months.

C

At sentencing, defendant objected to the scoring of offense variable (OV) 5 and OV 6. The trial court assessed 15 points for OV 5, finding that the evidence and testimony were sufficient to establish psychological injury, especially in light of the trial court's opportunity to observe the witnesses as they testified, and concluding that there was "no question that psychological injury would be an issue" when a father discovered his son with a slit throat, which was allegedly performed by his son's friend. The trial court assessed 50 points for OV 6 based on its finding that the jury's verdict and the evidence presented at trial demonstrated that defendant had "a clear, premeditated intent to kill in addition to an intent to rob." Apart from indicating that it believed that defendant intended to torture Anton when he committed the assault, the trial court did not specify the portions of testimony or evidence from which he discerned a premeditated intent to kill. Later, the trial court reiterated that it would score 50 points for OV 6 in light of defendant's statement that he knew the individuals who stole the property from the residence, defendant's offer to return the property, the fact that defendant actually returned some of the property, and the fact that some of the stolen property was found in defendant's car after the incident.

The trial court departed from the minimum range recommended by the sentencing guidelines, i.e., 171 to 285 months' imprisonment, by 75 months, imposing a sentence of 30 to 60 years' imprisonment for the assault with intent to commit murder conviction. The trial court provided the following reasons for its departure:

[T]he first two factors that the prosecutor mentions the horrendous, brutal assault on this young man when [it] basically appeared [from] the facts that you thought he was somehow rendered weak or incapacitated by his drug use at that time.

And the action taken by you towards a person who considers you a friend does substantiate the thought that you are a person without a conscience, a person who's violent and depraved and that this is an assault that is quite shocking even to people who have been in the courts for 20 and more years.

The Court is going to sentence you accordingly to 30 to 60 years on the charge of assault with intent to commit murder and one to five concurrently on the charge of receiving stolen property between the amounts of [$]1,000 but less than $20,000.

II

First, defendant raises three related claims concerning the prosecution's responsibility to present Evans as a res gestae witness and the trial court's exclusion of Evans's testimony. He first contends that the prosecution violated its duty to present the res gestae of the case by failing to acknowledge that Evans was a res gestae witness and by objecting to defendant's efforts to call Evans as a witness, thereby depriving defendant of his right to present a defense. We disagree.

Because a defendant must move in the trial court for a posttrial evidentiary hearing or a new trial preserve a claim that the prosecution failed to produce a res gestae witness, this issue is not preserved for appeal. *People v Dixon*, 217 Mich App 400, 409; 552 NW2d 663 (1996). Unpreserved issues are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). To demonstrate such an error, the defendant must show that (1) an error occurred, (2) the error was clear or obvious, and (3) "the plain error affected [the defendant's] substantial rights," which "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.* at 763. Reversal is warranted only if the error resulted in conviction despite defendant's actual innocence or if the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id.* at 763-764.

Because Evans's second statement to the police indicated that he was present when the assault occurred, Evans is arguably a res gestae witness, i.e., "one who is present at the scene of the alleged crime, at the time of the alleged crime, or one who had occasion to observe the surrounding events and circumstances." *People v Dyer*, 425 Mich 572, 577 n 4; 390 NW2d 645 (1986). Contrary to defendant's argument on appeal, following the enactment of MCL 767.40a, the prosecution no longer has an affirmative duty to present the "entire res gestae," or call at trial all of the witnesses who were present when a crime occurred. *People v Koonce*, 466 Mich 515, 518-519; 648 NW2d 153 (2002). Under MCL 767.40a, the prosecutor has a duty to disclose "all known res gestae witnesses, to update the list as additional witnesses became known, and to provide to the defendant a list of witnesses the prosecution intend[s] to call at trial." *Koonce*, 466 Mich at 517-521, citing MCL 767.40a(1)-(3). The prosecutor is also "compelled to render reasonable assistance in locating and serving process upon witnesses upon the request of the defendant." *Koonce*, 466 Mich at 521, citing MCL 767.40a(5).

Although the prosecutor did not include Evans as a known res gestae witness on his witness list, the record shows that the prosecutor's omission did not prejudice defendant, *Carines*, 460 Mich at 763, or violate his right to present a defense, *People v Unger*, 278 Mich App 210, 249-250; 749 NW2d 272 (2008). Because defendant implicated Evans in the assault, it is apparent that defendant was aware that Evans could be a res gestae witness. The prosecutor subpoenaed Evans and produced him for trial in the event that the trial court ruled that Evans constituted a res gestae witness and defendant desired to call him, thereby satisfying the prosecution's obligations under MCL 767.40a even though he did not intend to present Evans as a witness. As discussed *infra*, the prosecutor properly notified the trial court before trial of the possible need for Evans to be informed of his Fifth Amendment right against self-incrimination. *Dyer*, 425 Mich at 578 n 5. Because Evans invoked his Fifth Amendment privilege against self-incrimination and refused to testify, neither the prosecution nor the defense could call Evans as a

witness. *People v Paasche*, 207 Mich App 698, 709; 525 NW2d 914 (1994). Thus, there is no indication that the prosecution committed a plain error affecting defendant's substantial rights by failing to include Evans on the witness list as a res gestae witness, notifying the trial court of the need to inform Evans of his Fifth Amendment right against self-incrimination, and failing to call Evans as a witness.

Defendant next asserts that the trial court failed to adequately inquire into whether Evans validly asserted his Fifth Amendment privilege against self-incrimination, and that the trial court erroneously concluded Evans had a valid Fifth Amendment privilege. As such, defendant argues that the trial court deprived defendant of his right to present a defense when it precluded Evans from testifying. We disagree.

"The decision to admit evidence is within a trial court's discretion, which is reviewed for an abuse of that discretion." *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014). "Preliminary questions of law, such as whether a rule of evidence or statute precludes the admission of particular evidence, are reviewed de novo, and it is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *Id.* A trial court "abuse[s] its discretion only when its decision falls outside the principled range of outcomes." *People v Blackston*, 481 Mich 451, 460; 751 NW2d 408 (2008). Additionally, "[w]hether a defendant's right to present a defense was violated by the exclusion of evidence is a constitutional question that this Court reviews de novo." *People v Mesik (On Reconsideration)*, 285 Mich App 535, 537-538; 775 NW2d 857 (2009).

The Fifth Amendment to the United States Constitution and Article 1, § 17 of the Michigan Constitution provide that "[n]o person shall be compelled in any criminal case to be a witness against himself." *People v Wyngaard*, 462 Mich 659, 671; 614 NW2d 143 (2000); *People v Schollaert*, 194 Mich App 158, 164; 486 NW2d 312 (1992). "This prohibition 'not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.' " *Wyngaard*, 462 Mich at 671-672; quoting *Minnesota v Murphy*, 465 US 420, 426; 104 S Ct 1136; 79 L Ed 2d 409 (1984). Thus, a witness, as well as the accused, has a right to exercise his privilege against self-incrimination. *Dyer*, 425 Mich at 578. An attorney is not permitted to knowingly call a witness when he is aware that the witness "will claim a valid privilege not to testify" because "critical weight is added to the prosecution's case" and an "adverse inference . . . may be drawn against the defendant by the jury from the claim of testimonial privilege." *Paasche*, 207 Mich App at 709 (quotation marks and citation omitted).

Michigan courts have recognized a procedure for "protect[ing] the defendant's rights when the trial court is confronted with a potential witness who plans to assert a testimonial privilege." *Id*. "The proper procedure is for the prosecutor to inform the court, out of the presence of the witness" and the jury, "of the possible need for the witness to be informed of Fifth Amendment rights." *Dyer*, 425 Mich at 578 n 5. The "trial court must determine whether the witness understands the privilege and must provide an adequate explanation if the witness does not." *Paasche*, 207 Mich App at 709-710. "[T]he court must then hold an evidentiary hearing outside of the jury's presence to determine the validity of the witness'[s] claim of privilege." *Id.* at 709. "If the court determines the assertion of the privilege to be valid, the

inquiry ends and the witness is excused." *Id.* However, "[i]f the assertion of the privilege is not legitimate in the opinion of the trial judge, the court must then consider methods to induce the witness to testify, such as contempt and other proceedings." *Id.* If the witness still refuses to testify, "the court must proceed to trial without the witness, because there is no other way to prevent prejudice to the defendant." *Id*. at 709-710.

The record reveals that the trial court complied with the applicable procedure and properly ordered that Evans could not be called as a witness. The prosecutor informed the trial court at a pretrial hearing of the possibility that Evans may assert his privilege against self-incrimination if he testified at trial. The trial court appointed counsel for Evans and later held a hearing outside the presence of the jury to determine whether Evans intended to invoke his Fifth Amendment privilege. As defendant asserts, the trial court did not question Evans or make an explicit determination on the record concerning the validity of Evans's assertion of the privilege against self-incrimination. Instead, the trial court conducted an inquiry with Evans's appointed counsel, who indicated that he had counseled Evans regarding his Fifth Amendment privilege, that he had advised Evans not to testify based on the "potentially dangerous" nature of Evans's prospective testimony—given Evans's inconsistent statements to the police and potential testimony that he was present when the assault occurred—and that Evans had decided not to testify. As such, the record shows that the trial court was notified that Evans's attorney had counseled Evans regarding his Fifth Amendment privilege and that the trial court was aware of the underlying factual basis that supported Evans's assertion of his Fifth Amendment privilege. Additionally, the trial court was aware that defendant had implicated Evans as the perpetrator of the assault, and, therefore, any further questioning of Evans regarding the validity of the assertion of his privilege may have incriminated Evans. See *People v Lawton*, 196 Mich App 341, 346-347; 492 NW2d 810 (1992); *Dyer*, 425 Mich at 579. We also find significant that, before trial, the trial court provided defense counsel with an opportunity to further question Evans's appointed counsel regarding Evans's intent to assert his Fifth Amendment rights, but defense counsel did not avail himself of that opportunity; defendant cannot now complain of the trial court's procedure. See *Lawton*, 196 Mich App at 346.

Moreover, we find that Evans validly asserted his Fifth Amendment privilege, and the trial court properly excused Evans as a witness. *Paasche*, 207 Mich App at 709. To properly assert such a privilege, a witness must have a "reasonable basis . . . to fear incrimination from questions." *Dyer*, 425 Mich at 578. Thus, "a trial court may compel a witness to answer a question only where the court can foresee, as a matter of law, that such testimony could not incriminate the witness." *Id.* at 579 (citation omitted). Defendant's statements to the police, his theory of the case, and his testimony at trial indicate that Evans may have been intimately associated with the criminal transaction or involved with the commission of the crimes, thereby demonstrating a reasonable basis for Evans to fear incrimination from questions regarding his participation. *Id.* at 578. Additionally, the prosecutor indicated that he was unable to predict whether charges would be brought against Evans after he testified, which left open the opportunity of future prosecution. On this record, we find that Evans had a reasonable basis to fear incrimination from questioning about the criminal episode, and it is not evident that the trial court could have found, as a matter of law, that Evans's testimony could not incriminate him. *Id.* at 578-579. Accordingly, the trial court did not abuse its discretion when it excluded Evans as a witness. *Bynum*, 496 Mich at 623; *Dyer*, 425 Mich at 578.

Finally, the trial court's preclusion of Evans's testimony did not violate defendant's right to present a defense. A defendant has a constitutionally guaranteed right to present a defense, which includes the right to call witnesses. *Unger*, 278 Mich App at 249-250. "However, an accused's right to present evidence in his defense is not absolute." *Id.* at 250; citing *United States v Scheffer*, 523 US 303, 308; 118 S Ct 1261; 140 L Ed 2d 413 (1998); *Crane v Kentucky*, 476 US 683, 690; 106 S Ct 2142; 90 L Ed 2d 636 (1986). "The accused must still comply with 'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.' " *People v Hayes*, 421 Mich 271, 279; 364 NW2d 635 (1984), quoting *Chambers v Mississippi*, 410 US 284, 302; 93 S Ct 1038; 35 L Ed 2d 297 (1973). Likewise, as recognized by the Sixth Circuit, "[a] defendant's right to force a witness to testify must yield to that witness'[s] assertion of his Fifth Amendment privilege against self incrimination, where it is 'grounded on a reasonable fear of danger of prosecution." *United States v Gaitan-Acevedo*, 148 F3d 577, 588 (CA 6, 1998) (quotation marks and citation omitted). Thus, when a witness legitimately exercises his Fifth Amendment right against self-incrimination and refuses to testify, neither the prosecution nor the defense can call him as a witness. *Dyer*, 425 Mich at 576; *Paasche*, 207 Mich App at 709. Through his own testimony and testimony elicited from a detective[5] and McIntyre, defendant was able to present his defense theory that Evans was at the scene of the crime and committed the assault. Thus, the trial court did not deprive defendant of his right to present a defense. *Unger*, 278 Mich App at 249-250.

III

Second, defendant argues that the trial court abused its discretion in excluding as inadmissible hearsay Evans's statement[6] to the police that he was present during the assault because it was admissible under the statement against penal interest exception to the hearsay rule, MRE 804(b)(3), or under the "catchall" exception to the hearsay rule, MRE 804(b)(7). We disagree.

This Court "use[s] a clearly erroneous standard in reviewing the trial court's findings of fact and an abuse of discretion standard in reviewing the trial court's decision to exclude the evidence." *People v Barrera*, 451 Mich 261, 269; 547 NW2d 280 (1996). However, whether a statement was against a declarant's penal interest is a question of law that this Court reviews de novo. *Id.* at 268.

" 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay statements are not admissible unless they fall under a recognized exception to the

---

[5] A detective testified that defendant claimed that Evans was present at the scene, which was why the detective obtained a DNA sample from Evans and submitted it for forensic testing in an attempt to eliminate "a secondary DNA sample that was on the knife handle."

[6] Defendant only appears to assert that the trial court erred in failing to admit Evans's statement that he was present at the crime scene, not the first statement that Evans made to the police, during which he denied that he was present during the offense.

hearsay rule. MRE 802. MRE 804(b)(3) provides an exception for a statement against interest, which is defined as

> [a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. [MRE 804(b)(3).]

Under that rule, "if a declarant is unavailable,[7] as defined in MRE 804(a), his out-of-court statement against interest may avoid the hearsay rule if certain thresholds are met." *Barrera*, 451 Mich at 267 (footnote added). "A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." MRE 804(b)(3). Whether to admit or exclude a statement against a witness's penal interest offered under MRE 804(b)(3) is determined by considering "(1) whether the declarant was unavailable, (2) whether the statement was against penal interest, (3) whether a reasonable person in the declarant's position would have believed the statement to be true, and (4) whether corroborating circumstances clearly indicated the trustworthiness of the statement." *Barrera*, 451 Mich at 268. A statement against a declarant's penal interest is "not limited to 'direct confessions,' " "need not by itself prove the declarant guilty," and "need not have been incriminating on its face, as long as it was self-incriminating when viewed in context." *Id*. at 270-271.

> In exercising its discretion, the trial court must conscientiously consider the relationship between MRE 804(b)(3) and a defendant's constitutional due process right to present exculpatory evidence. Likewise, appellate review necessarily requires a review of the importance of the statement to the defendant's theory of defense in determining whether the trial court abused its discretion by excluding the evidence. [*Id*. at 269 (citation omitted).]

The trial court properly concluded that Evans's second police statement was not a statement against his penal interest. Evans admitted that he was present during the assault after the detective told Evans that defendant had blamed Evans for planning and committing the assault and the detective claimed that he knew for a fact that Evans was present at the scene of the crime. The context of Evans's admission included an extensive explanation of the way in which defendant planned and executed the assault against Anton, which does not demonstrate that the statement "so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." MRE 804(b)(3). Instead, it appears that Evans made the statement in order to emphasize that he was merely present during the offense and had no role in its commission. See *People v Wilson*, 196 Mich App 604, 614; 493 NW2d 471 (1992) (stating that mere presence is

---

[7] There is no dispute that Evans was unavailable under MRE 804(a) due to his assertion of his Fifth Amendment privilege against self-incrimination. *People v Meredith*, 459 Mich 62, 66; 586 NW2d 538 (1998).

insufficient to prove that someone aided and abetted the commission of a crime). Likewise, "the mere fact that the declarant invoked his Fifth Amendment right not to testify does not make the statement against penal interest." *Barrera*, 451 Mich at 270.

However, even if we construe Evan's statement as being against his penal interest because of his earlier inconsistent statement to the police, we conclude that there were no corroborating circumstances clearly indicating the trustworthiness of the statement for the reasons discussed below regarding MRE 804(b)(7). See *Barrera*, 451 Mich at 274-275 (adopting a totality-of-the circumstances test). In this case, Evans's statement was not crucial to defendant's theory of defense because it clearly implicates him in the assault. As such, "other factors [were appropriately] interjected to weigh against admission of the statement." *Id*. at 279-280.

Moreover, because Evans was in custody when he made the statement to the authorities, there are three additional factors that must be considered—the relationship between the confessing party and the exculpated party and whether the confessor was likely fabricating the story for the benefit of his friend, whether the statement was voluntarily made after *Miranda* warnings were provided, and whether the statement was made in order to curry favor with authorities. *Id*. at 275-276. Here, because the statement incriminated rather than exculpated the defendant, Evans did not likely make the statement to benefit defendant. In addition, while there was no evidence that the statement was involuntarily made or made to curry favor with authorities, nevertheless, the totality of the circumstances weighs against admission. Accordingly, the trial court did not abuse its discretion when it precluded the admission of Evans's statement under MRE 804(b)(3).

Likewise, the trial court did not abuse its discretion when it concluded that Evans's statement to the police was not admissible under the catchall exception to the hearsay rule when the declarant is unavailable, MRE 804(b)(7).[8] MRE 804(b)(7) provides for admission of a statement that is not specifically covered by any of the other hearsay exceptions under MCR 804(b),

> but [has] equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact, (B) the statement is more probative on the point for which it is offered than any other evidence that the proponent can procure through reasonable efforts, and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

In interpreting MRE 803(24), which is nearly identical to MRE 804(b)(7), the Michigan Supreme Court has stated, "[t]he first and most important requirement is that the proffered statement have circumstantial guarantees of trustworthiness equivalent to those of the categorical hearsay exceptions." *People v Katt*, 468 Mich 272, 290; 662 NW2d 12 (2003). A trial court

---

[8] Defendant cites MRE 803(24) in his brief on appeal, which is the catchall exception applicable when the availability of the declarant is immaterial. However, he moved in the trial court for the admission of Evans's statement under MRE 804(b)(7).

"should consider the 'totality of the circumstances' surrounding each statement to determine whether equivalent guarantees of trustworthiness exist." *Id*. at 291. Although "[t]here is no complete list of factors that establish whether a statement has equivalent guarantees of trustworthiness," *id*., some relevant factors include:

> (1) the spontaneity of the statements, (2) the consistency of the statements, (3) lack of motive to fabricate or lack of bias, (4) the reason the declarant cannot testify, (5) the voluntariness of the statements, i.e., whether they were made in response to leading questions or made under undue influence, (6) personal knowledge of the declarant about the matter on which he spoke, (7) to whom the statements were made . . . , and (8) the time frame within which the statements were made. [*People v Geno*, 261 Mich App 624, 634; 683 NW2d 687 (2004) (quotation marks and citation omitted).]

The totality of the circumstances does not demonstrate that Evans's statement is trustworthy. It is evident Evans had personal knowledge of whether he was present when the assault occurred, and there is no indication that Evans's statement was involuntary, especially given that the detective informed Evans of his *Miranda*[9] rights before Evans made the statement. However, his admission was not spontaneous and was only provided to the police after the detective reiterated that defendant had implicated him in the assault and the detective stated that he knew that Evans was present during the assault. Additionally, Evans's statements were not consistent, as he expressly denied being present when the assault occurred during his first statement to the police, when he was also aware that defendant had implicated him as the perpetrator. Evans's admission that he was present was provided approximately four months after the assault while he was in custody for a separate offense. Accordingly, the trial court did not abuse its discretion when it precluded the admission of Evans's statement under MRE 804(b)(7).

IV

Third, defendant raises three claims related to the prosecution's use of McIntyre's prior inconsistent statement (i.e., that on the night of the assault, defendant told McIntyre that he stabbed Anton) as substantive evidence of defendant's guilt. Defendant argues that his right to a fair trial was violated by the prosecutor's use of McIntyre's prior inconsistent statement as substantive evidence of his guilt and the trial court's failure to provide a proper cautionary instruction. Additionally, defendant asserts that defense counsel's failure to object to the trial court's improper jury instruction constituted ineffective assistance of counsel. We reject defendant's claims.

Because defendant did not object to the prosecutor's use of McIntyre's statement, request a limiting instruction, or object to the jury instructions provided by the trial court, this issue is not preserved for appeal. *People v Grant*, 445 Mich 535, 545-546, 553; 520 NW2d 123 (1994); *People v Sabin*, 242 Mich App 656, 657; 620 NW2d 19 (2000). Accordingly, defendant must

---

[9] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

demonstrate plain error affecting his substantial rights. *Carines*, 460 Mich at 763-764.[10] To the extent that defendant challenges the jury instructions provided by the trial court, he affirmatively waived any claim of error when defense counsel expressed satisfaction with the instructions provided by the trial court. *People v Gaines*, 306 Mich App 289, 310-311; 856 NW2d 222 (2014).

Defendant's ineffective assistance claim is not preserved for appeal because defendant did not move in the trial court for a new trial or a *Ginther*[11] hearing. *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). As such, this Court's review of the issue is limited to errors apparent from the trial court record. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). "A claim of ineffective assistance of counsel is a mixed question of law and fact. A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *Id*., citing *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). In order to prove that defense counsel provided ineffective assistance, a defendant must demonstrate that (1) " 'counsel's representation fell below an objective standard of reasonableness,' " and (2) defendant was prejudiced, i.e., "that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Vaughn*, 491 Mich at 669-671, quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "[D]efendant must also show that the result that did occur was fundamentally unfair or unreliable." *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012).

Extrinsic evidence of a prior inconsistent statement can be used "to impeach a witness even though the statement tends to directly inculpate the defendant." *People v Kilbourn*, 454 Mich 677, 682; 563 NW2d 669 (1997); see also MRE 613(b). "The purpose of extrinsic impeachment evidence is to prove that a witness made a prior inconsistent statement—not to prove the contents of the statement." *People v Jenkins*, 450 Mich 249, 256; 537 NW2d 828 (1995). As such, "[a] prosecutor may not use an elicited denial as a springboard for introducing substantive evidence under the guise of rebutting the denial." *People v Stanaway*, 446 Mich 643, 693; 521 NW2d 557 (1994). "[P]rior unsworn statements of a witness are mere hearsay and are generally inadmissible as substantive evidence." *People v Lundy*, 467 Mich 254, 257; 650 NW2d 332 (2002). Thus, McIntyre's prior inconsistent statement during which she incriminated defendant could not be admitted to prove the truth of the matter asserted unless it fell within a recognized hearsay exception. MRE 802; *People v Musser*, 494 Mich 337, 350; 835 NW2d 319 (2013); see also *Jenkins*, 450 Mich at 261-262.

---

[10] We reject the prosecution's argument that defendant waived this issue by introducing McIntyre's police statement in its entirety. In light of the prosecutor's initial introduction of McIntyre's prior inconsistent statement, we find that defendant permissibly "explore[d] the extent of the inconsistencies by showing how those statements were consistent with" McIntyre's trial testimony, *People v Sayles*, 200 Mich App 594, 595; 504 NW2d 738 (1993); see also MRE 801(d)(1)(B), and did not invite the purported error.

[11] *People v Ginther*, 390 Mich 436, 443-444; 212 NW2d 922 (1973).

The record shows that the prosecutor impermissibly used McIntyre's statement as substantive evidence by arguing that the final piece of evidence was McIntyre's statement to the police that, on the night of the assault, defendant told her that he stabbed Anton. The prosecution does not argue that McIntyre's statement was admissible under a hearsay exception, nor do we believe that an exception applies. Compounding this error, the trial court instructed the jury at the end of the trial, in accordance with M Crim JI 4.5(2), that the jury could consider prior inconsistent statements as substantive evidence. Because McIntyre's police statement implicating defendant in the assault was admissible only to impeach her testimony, the prosecution's use of the statement as substantive evidence of defendant's guilt, and the trial court's instruction, constituted plain error. *Carines*, 460 Mich at 763-764, 768, 774. Likewise, given that a jury is presumed to follow a trial court's instructions, *People v Meissner*, 294 Mich App 438, 457; 812 NW2d 37 (2011), it is probable that the jury impermissibly considered McIntyre's statement as substantive evidence that defendant committed the assault.

However, in light of the extensive evidence admitted at trial linking defendant to the assault, we find that these errors did not prejudice defendant. *Carines*, 460 Mich at 763-764, 772, 774. McIntyre's trial testimony and the admission of McIntyre's police interviews in their entirety confirmed that she also told the defective that (1) defendant told her that Anton was stabbed but did not indicate who stabbed him, and (2) defendant told her that he did not commit the act, both of which were consistent with her written police statement and with her trial testimony. Additionally McIntyre testified that she lied to the detective when she told him that defendant had admitted that he stabbed Anton and that she immediately recanted her statement implicating defendant when she left the police station. Further, apart from McIntyre's incriminating police statement, the consistent testimony of Anton, Rory, and Suzanne, as well as the physical evidence linking defendant to the crime, provided overwhelming evidence that defendant committed the assault. Therefore, the substantive use of McIntyre's statement did not constitute a plain error that affected defendant's substantial rights. *Id*. at 763-764, 774.

For the same reasons, we conclude that defense counsel's performance did not constitute ineffective assistance. Defense counsel's performance arguably fell below an objective standard of reasonableness when he failed to object to the prosecution's improper use of McIntyre's prior inconsistent statement as substantive evidence of defendant's guilt, object to the jury instructions as given, or request a limiting instruction regarding the use of McIntyre's statement. *Vaughn*, 491 Mich at 669-671. However, in light of the overwhelming evidence implicating defendant as the perpetrator of the assault, there is not a reasonable probability that the result of the proceedings would have been different but for counsel's errors.[12] *Id.*

---

[12] Additionally, defense counsel employed sound trial strategy by introducing McIntyre's police statements in their entirety, which allowed the jury to review the portions of the interview during which McIntyre indicated that defendant did not admit that he stabbed Anton and during which the police officer allegedly pressured McIntyre into falsely stating that defendant admitted that he committed the assault.

V

Fourth, defendant argues that the prosecutor's improper comments and arguments violated his right to a fair trial. We disagree.

"Review of alleged prosecutorial misconduct is precluded unless the defendant timely and specifically objects, except when an objection could not have cured the error, or a failure to review the issue would result in a miscarriage of justice." *Unger*, 278 Mich App at 234-235. Preserved claims of prosecutorial misconduct are reviewed de novo. *People v Abraham*, 256 Mich App 265, 272; 662 NW2d 836 (2003). Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting substantial rights. *Unger*, 278 Mich App at 234-235, citing *Carines*, 460 Mich at 763.

"The test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "[A]llegations of prosecutorial misconduct are considered on a case-by-case basis, and the reviewing court must consider the prosecutor's remarks in context." *People v Bennett,* 290 Mich App 465, 475; 802 NW2d 627 (2010). "[A] prosecutor's comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial." *People v Callon*, 256 Mich App 312, 330; 662 NW2d 501 (2003) (citations omitted). Additionally, this Court may not "find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Bennett*, 290 Mich App at 476 (internal quotation marks and citation omitted).

First, defendant argues that the prosecutor improperly expressed his opinion regarding defendant's credibility and guilt by repeatedly referring to defendant's account of the incident as a lie during his closing argument. We disagree.

Defendant did not object to these allegedly improper characterizations of defendant's testimony until defense counsel objected to the prosecutor's characterization of defendant's testimony as a "story" during the prosecution's rebuttal argument. The comments to which defendant did not object are unpreserved and reviewed for plain error affecting defendant's substantial rights, *Brown*, 294 Mich App at 382; *Unger*, 278 Mich App at 234-235, and the comment to which defendant did object is preserved and reviewed do novo, *Abraham*, 256 Mich App at 272.

Prosecutors are accorded "wide latitude" with regard to their arguments during trial. *People v Bahoda*, 448 Mich 261, 282-283; 531 NW2d 659 (1995); *Dobek*, 274 Mich App at 66. In general, prosecutors are "free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *Unger*, 278 Mich App at 236. However, "prosecutors should not . . . express their personal opinion of a defendant's guilt, and must refrain from denigrating a defendant with intemperate and prejudicial remarks." *Bahoda*, 448 Mich at 282-283. A prosecutor must also refrain from suggesting or implying that he has special knowledge regarding whether a witness is worthy of belief, *id*. at 276; *Dobek*, 274 Mich App at 66, but a "prosecutor may argue from the facts that a witness, including the defendant, is not worthy of belief, and is not required to state inferences and conclusions in the blandest possible terms," *People v Launsburry*, 217 Mich App 358, 361; 551 NW2d 460 (1996) (citations

omitted); see also *People v Howard*, 226 Mich App 528, 548; 575 NW2d 16 (1997).

The prosecutor's characterization of defendant's account of the criminal episode as a lie or a "story" did not deprive defendant of a fair and impartial trial, *Dobek*, 274 Mich App at 63, or constitute a plain error that affected defendant's substantial rights, *Unger*, 278 Mich App at 234-235. Reviewing the challenged comments in context, it is evident that the prosecutor's references to defendant's account of the incident as a lie properly advanced the prosecution's position that defendant's testimony was not credible in light of the contradictory evidence adduced at trial. During his closing argument, the prosecutor pointed out the inconsistencies in defendant's testimony and explained why he believed that defendant's account of the criminal episode was not worthy of belief. The prosecutor did not improperly imply that he had special knowledge that defendant fabricated his account of the incident. Thus, the prosecutor's argument was properly based on the evidence admitted at trial. *Unger*, 278 Mich App at 236; *Howard*, 226 Mich App at 548. Likewise, the prosecutor's references to defendant's account of the criminal episode as a lie were not improper, as the prosecutor was not required to use the blandest possible language in presenting his argument. *Unger*, 278 Mich App at 239.

Moreover, any prejudice that may have resulted from the prosecutor's remarks was cured by the trial court's jury instructions, which indicated that the lawyers' statements and arguments were not evidence; that it is the jurors' responsibility to decide the facts of the case, to determine which witnesses to believe, and to assess the importance of their testimony; and that the jurors should rely on their own common sense and everyday experiences in deciding which testimony to believe. "[J]urors are presumed to follow their instructions." *Id*. at 235.

Second, defendant argues that the prosecutor impermissibly shifted the burden of proof by arguing that the defense had Anton's medical records and could have introduced them at trial. We disagree.

We review this unpreserved issue for plain error affecting defendant's substantial rights. See *Brown*, 294 Mich App at 382; *Unger*, 278 Mich App at 235. "[A] prosecutor may not comment on a defendant's failure to testify or present evidence, i.e., the prosecutor may not attempt to shift the burden of proof." *Abraham*, 256 Mich App at 273. "[T]he prosecutor's comments must be considered in light of defense counsel's comments," and "an otherwise improper remark may not rise to an error requiring reversal when the prosecutor is responding to the defense counsel's argument." *People v Watson*, 245 Mich App 572, 592-593; 629 NW2d 411 (2001) (quotation marks and citation omitted).

During his closing argument, defense counsel advanced the theory that the prosecutor failed to present a "fair [and] meaningful evaluation" of Anton's injuries to the jury by failing to present Anton's medical records, insinuating that the records did not support the prosecution's theory of the case. As such, it is evident that the prosecutor's statements regarding defendant's opportunity to present the medical records were made in response to defense counsel's argument that the prosecutor deficiently or unfairly failed to present Anton's medical records. Furthermore, the prosecutor did not actually argue that defendant should have introduced Anton's medical records; he only argued that defendant could have introduced the medical records if he believed that something in the records was significant, which, at most, implied that defendant had no reason to introduce the records and did not shift the burden of proof to

defendant. Moreover, defendant is unable to demonstrate the requisite prejudice in light of the prosecutor's repeated reminders during his argument that defendant was not obligated to produce any evidence whatsoever and that the prosecutor had the burden of proof. Additionally, because any prejudicial effect caused by the challenged comment was cured by the trial court's instruction to the jury indicating that the prosecution, and not defendant, had the burden of proof, *Dobek*, 274 Mich App at 68, we find no error requiring reversal, *Bennett*, 290 Mich App at 476 (internal quotation marks and citation omitted).

Defendant also argues that the prosecutor erroneously referred to an extrajudicial fact when he stated that the defense had the medical records for three months. "A prosecutor may not make a statement of fact to the jury that is unsupported by the evidence in the case." *People v Fisher*, 193 Mich App 284, 291; 483 NW2d 452 (1992). However, this error was cured by the trial court's instruction that "[t]he lawyer[s'] statements and their arguments are not evidence[;] they're only meant to help you understand the evidence and each side[']s legal theory," and there is no indication that the prosecutor's comment denied defendant a fair and impartial trial. *Dobek*, 274 Mich App at 63, 68.

Finally, defendant argues that the prosecutor misled the jury and misrepresented the evidence presented at trial by arguing that no one else was present when the assault occurred except for defendant and Anton, despite the prosecutor's knowledge that Evans admitted to the police that he was present during the assault. We disagree.

Because defendant objected and moved for a mistrial on the basis of the prosecutor's comment, which the trial court denied, *Brown,* 294 Mich App at 382, the prosecutor's comment is reviewed de novo to determine whether it denied defendant a fair and impartial trial, *Bennett*, 290 Mich App at 475. "Although a prosecutor may not argue a fact to the jury that is not supported by evidence, a prosecutor is free to argue the evidence and any reasonable inferences that may arise from the evidence." *Callon*, 256 Mich App at 330.

Anton, Rory, and Suzanne testified that the only other person that they saw in the house before and after the incident was defendant. Additionally, Rory testified that he only saw defendant leave the house after the assault. Considering this testimony, the prosecutor properly argued the evidence admitted at trial and reasonable inferences arising from the evidence, *id*., and did not violate defendant's right to a fair trial, *Bennett*, 290 Mich App at 475.

VIII

Lastly, defendant raises several issues related to the validity of his sentences. We remand for further proceedings consistent with this opinion.

As a preliminary matter, we must consider the Michigan Supreme Court's recent decision in *People v Lockridge*, ___ Mich ___; ___ NW2d ___ (2015). In *Lockridge*, the Court held that "the rule from *Apprendi v New Jersey,* 530 US 466; 120 S Ct 2348; 147 L Ed 2d 435 (2000), as extended by *Alleyne v United States,* 570 US ___; 133 S Ct 2151; 186 L Ed 2d 314 (2013), applies to Michigan's sentencing guidelines and renders them constitutionally deficient," *id*. at ___; slip op at 1, meaning that "to the extent that the OVs scored on the basis of facts not admitted by the defendant or necessarily found by the jury verdict increase the floor of the

guidelines range, i.e. the defendant's 'mandatory minimum' sentence, that procedure violates the Sixth Amendment," *id*. at ___; slip op at 11. Accordingly,

> [t]o remedy the constitutional violation, [the Court] sever[ed] MCL 769.34(2) to the extent that it makes the sentencing guidelines range as scored on the basis of facts beyond those admitted by the defendant or found by the jury beyond a reasonable doubt mandatory. [The Court] also str[uck] down the requirement in MCL 769.34(3) that a sentencing court that departs from the applicable guidelines range must articulate a substantial and compelling reason for that departure. [*Id*. at ___; slip op at 2.]

The Court also stated:

> [A] guidelines minimum sentence range calculated in violation of *Apprendi* and *Alleyne* is advisory only and that sentences that depart from that threshold are to be reviewed by appellate courts for reasonableness. To preserve as much as possible the legislative intent in enacting the guidelines, however, we hold that a sentencing court must determine the applicable guidelines range and take it into account when imposing a sentence. [*Id*. ___; slip op at 2 (citations omitted).]

Likewise, the Court indicated that "[o]ur holding today does nothing to undercut the requirement that the highest number of points possible *must be* assessed for all OVs, whether using judge-found facts or not." *Id*. at ___; slip op at 29 n 28. Therefore, we conclude that, given the continued relevance of the scoring variables to the Michigan sentencing scheme, the standards of review traditionally applied to the trial court's scoring of the variables remain viable after *Lockridge*.

> [T]he circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo. [*People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013) (citations omitted).]

This Court reviews de novo, as a question of law, the proper interpretation of the sentencing guidelines. *People v Gullett*, 277 Mich App 214, 217; 744 NW2d 200 (2007).

First, defendant argues that the trial court erred in scoring OV 5 because there was insufficient evidence that Anton's parents sustained serious psychological injury. The statutory basis of OV 5 is MCL 777.35, which provides for an assessment of points when there "is psychological injury to a member of a victim's family." MCL 777.35(1). Fifteen points shall be assessed if "[s]erious psychological injury requiring professional treatment occurred to a victim's family." MCL 777.35(1)(a). Zero points shall be assessed if "[n]o serious psychological injury requiring professional treatment occurred to a victim's family." MCL 777.35(1)(b). "[T]he fact that treatment has not been sought is not conclusive," MCL 777.35(2), but "[t]here must be some evidence of psychological injury on the record," see *Lockett*, 295 Mich App at 183 (discussing the assessment of points under OV 4 in circumstances where "[s]erious psychological injury

requiring professional treatment occurred to a victim.")

The trial testimony, which indicated that Anton's parents were present in their home when the crime occurred and found their son with his throat slashed by someone whom they believed to be their son's close friend, clearly demonstrated the traumatic nature of the incident. The trial court's opportunity to observe the demeanor of Anton's parents during their testimony also supported the trial court's finding that Rory and Suzanne sustained psychological injury. Further, Anton testified at the sentencing hearing that his parents were "deeply affected" by the incident and are in the process of seeking psychological help. Accordingly, because the facts as found by the trial court were not clearly erroneous and were supported by a preponderance of evidence in the record, and because the evidence sufficiently demonstrates that Anton's parents sustained serious psychological injury that may require professional treatment, the trial court properly assessed 15 points for OV 5. *Hardy*, 494 Mich at 438; MCL 777.35(1)(a).

Second, defendant argues that the trial court erroneously assessed 50 points for OV 6 because there was insufficient evidence in the record to find that defendant had a premeditated intent to kill Anton. The statutory basis of OV 6 is MCL 777.36, which provides for an assessment of points based on "the offender's intent to kill or injure another individual." MCL 777.36(1). A trial court shall assess 50 points for OV 6 if "[t]he offender had premeditated intent to kill or [a] killing was committed while committing or attempting to commit" one of the offenses enumerated in MCL 777.36(1)(a).[13] Twenty-five points shall be assessed if "[t]he offender had unpremeditated intent to kill, the intent to do great bodily harm, or created a very high risk of death or great bodily harm knowing that death or great bodily harm was the probable result." MCL 777.36(1)(b). "The sentencing judge shall score this variable consistent with a jury verdict unless the judge has information that was not presented to the jury." MCL 777.36(2)(a).

"Premeditation, which requires sufficient time to permit the defendant to take a second look, may be inferred from the circumstances surrounding the killing." *People v Coy*, 243 Mich App 283, 315; 620 NW2d 888 (2000). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. . . . [P]remeditation and deliberation characterize a thought process undisturbed by hot blood." *People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998) (quotation marks and citation omitted). Nonexclusive "factors that may be considered to establish premeditation include the following: (1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted." *Id*. Additionally, "[p]remeditation and deliberation may be inferred from all the facts and circumstances, but the inferences must have support in the record and cannot be arrived at by mere speculation." *Id*. at

---

[13] The trial court erroneously considered defendant's "intent to rob" when it scored OV 6. A killing was not committed in this case, so defendant's purported attempt to commit robbery or larceny, which are two of the offenses enumerated in MCL 777.36(1)(a), was not relevant to the scoring of OV 6.

301.

The trial court's finding that defendant had a premeditated intent to kill was not clearly erroneous and was supported by a preponderance of evidence in the record. *Hardy*, 494 Mich at 438. Anton testified that he went upstairs to retrieve his marijuana and, when he returned to the basement, he was struck in the head, apparently without warning, and slit in the throat. When Anton woke up and realized that his throat had been slit, he saw defendant staring at him, "[j]ust wait[ing] for [him] to die." Defendant made no effort to assist Anton. There was no evidence of an altercation or argument between defendant and Anton immediately before the assault which could indicate that the attack was provoked or instigated by hot blood. From these circumstances, one could reasonably infer that defendant planned the attack before it occurred and was lying in wait to attack Anton when he returned to the basement, *Plummer*, 229 Mich App at 301, which justifies an assessment of 50 points under OV 6, MCL 777.36(1)(a); *Hardy,* 494 Mich at 438. Thus, we find no error in the trial court's scoring of the OVs.

In addition, defendant raises an *Apprendi/Alleyne* challenge, arguing that his Sixth and Fourteenth Amendment rights were violated because the trial court's scoring of OV 3, OV 4, OV 5, and OV 6 was based on impermissible judicial fact-finding, which increased the floor of the minimum range recommended by the sentencing guidelines. Because "defendant did not object to the scoring of the OVs at sentencing on *Apprendi/Alleyne* grounds, . . . our review is for plain error affecting substantial rights." *Lockridge*, ___ Mich at ___; slip op at 30.

In this case, the trial court departed from the minimum range recommended by the sentencing guidelines. Therefore, even if we assume that the facts necessary to score OV 3, OV 4, OV 5, and OV 6 were not established by the jury's verdict or admitted by defendant, defendant cannot establish plain error. As in *Lockridge*, because defendant

> received an upward departure sentence that did not rely on the minimum sentence range from the improperly scored guidelines (and indeed, the trial court necessarily had to state on the record its reasons for departing from that range), . . . defendant cannot show prejudice from any error in scoring the OVs in violation of *Alleyne*. [*Id*. at ___; slip op at 31.]

However, under *Lockridge*, this Court must review defendant's sentence for reasonableness.[14] *Id*. at ___; slip op at 2, 29, citing *United States v Booker*, 543 US 220, 264; 125 S Ct 738; 160 L Ed 2d 621 (2005). The appropriate procedure for considering the reasonableness of a departure sentence is not set forth in *Lockridge*. We conclude that there are two approaches that Michigan appellate courts could adopt in order to perform this reasonableness inquiry.

---

[14] Because a trial court is no longer required to provide a substantial and compelling reason for a departure from the sentencing guidelines under *Lockridge*, we need not review defendant's argument specifically concerning whether the reasons articulated by the trial court were substantial and compelling.

The first option is the standard of review currently employed by the federal courts. After determining whether the sentencing court committed a significant procedural error, federal appellate courts review the substantive reasonableness of a sentence for an abuse of discretion. See, e.g., *Gall v United States*, 552 US 38, 56; 128 S Ct 586; 169 L Ed 2d 445 (2007); *United States v Pirosko*, 787 F3d 358, 372 (CA 6, 2015); *United States v Feemster*, 572 F3d 455, 462 (CA 8, 2009). Under *Booker*, 543 US at 261, federal courts should be guided by the factors listed in 18 USC § 3553(a) in determining whether a sentence is reasonable.[15] The factors include: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to punish the offender, protect the public from the defendant, rehabilitate the defendant, and deter others; (4) the types of sentences available; (5) the sentencing range established by the sentencing guidelines; (6) pertinent policy statements issued by the United States Sentencing Commission; (7) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (8) the need for restitution. 18 USC § 3553(a).

The Eighth Circuit, among others, has noted the situations that would involve an abuse of discretion:

> [A]n abuse of discretion may occur when (1) a court fails to consider a relevant factor that should have received significant weight; (2) a court gives significant weight to an improper or irrelevant factor; or (3) a court considers only the appropriate factors but in weighing those factors commits a "clear error of judgment." A discretionary sentencing ruling, similarly, may be unreasonable if a sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case. [*United States v Haack*, 403 F3d 997, 1004 (CA 8, 2005) (citations omitted).]

See also *United States v Ressam*, 679 F3d 1069, 1086-1087 (CA 9, 2012). Federal appellate courts are permitted to "apply a presumption of reasonableness to a district court sentence that reflects a proper application of the Sentencing Guidelines," *Rita v United States*, 551 US 338, 347; 127 S Ct 2456; 168 L Ed 2d 203 (2007).[16]

---

[15] Federal district courts are required to first calculate the applicable guidelines range and subsequently "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 US at 49-50.

[16] For examples of the manner in which federal circuit courts have reviewed sentences for reasonableness with regard to § 3553(a), see *Gall*, 552 US at 46-60; *Pirosko*, 787 F3d 358, 372, 374-375 (CA 6, 2015); *United States v Rosales-Bruno*, 789 F3d 1249 (CA 11, 2015).

The second option is the standard of review that was in place under *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990), which is similar to the federal standard. When *Milbourn* was decided, the Legislature had not enacted the statutory sentencing guidelines; the guidelines in effect were those developed by the Michigan Supreme Court and promulgated by administrative order. *People v Hegwood*, 465 Mich 432, 438; 636 NW2d 127 (2001). Trial court judges were not required to impose a sentence within the range recommended by the sentencing guidelines; they were only required to score the guidelines and articulate the reasons for a departure from the recommended range. *Id*. In this context—which is strikingly similar to the role of the sentencing guidelines after *Lockridge*, see *Lockridge*, ___ Mich at ___; slip op at 29—the Michigan Supreme Court overruled the "shocks the conscience" test that was previous employed under *People v Coles*, 417 Mich 523, 550; 339 NW2d 440 (1983), and adopted the "principle of proportionality" test in order to determine whether a trial court abused its discretion in imposing a sentence. *Milbourn*, 435 Mich at 634-636. Under the new test, "a given sentence [could] be said to constitute an abuse of discretion if that sentence violate[d] the principle of proportionality, which require[d] sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Id*. at 636. As such, trial courts were required to impose a sentence that took "into account the nature of the offense and the background of the offender." *Id*. at 651.

With regard to the judicial sentencing guidelines, the Court stated:

The guidelines represent the actual sentencing practices of the judiciary, and we believe that the second edition of the sentencing guidelines is the best "barometer" of where on the continuum from the least to the most threatening circumstances a given case falls.

. . . We note that departures [from the guidelines] are appropriate where the guidelines do not adequately account for important factors legitimately considered at sentencing. . . . To require strict adherence to the guidelines would effectively prevent their evolution, and, for this reason, trial judges may continue to depart from the guidelines when, in their judgment, the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime. [*Id*. at 656-657.]

The Court also provided the following guidance for appellate courts reviewing a departure from the guidelines:

Where there is a departure from the sentencing guidelines, an appellate court's first inquiry should be whether the case involves circumstances that are not adequately embodied within the variables used to score the guidelines. A departure from the recommended range in the absence of factors not adequately reflected in the guidelines should alert the appellate court to the possibility that the trial court has violated the principle of proportionality and thus abused its sentencing discretion. Even where some departure appears to be appropriate, the extent of the departure (rather than the fact of the departure itself) may embody a violation of the principle of proportionality. [*Id*. at 659-660.]

Factors previously considered by Michigan courts under the proportionality standard included, among others, (1) the seriousness of the offense, *People v Houston*, 448 Mich 312, 321; 532 NW2d 508 (1995); (2) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, *id*. at 323; *Milbourn*, 435 Mich at 660, the defendant's misconduct while in custody, *Houston*, 448 Mich at 323, the defendant's expressions of remorse, *id*., and the defendant's potential for rehabilitation, *id*.; and (3) factors that were inadequately considered by the guidelines in a particular case, *id*. at 324.

The "principle of proportionality" previously employed by Michigan appellate courts is consistent with the standard of review employed by federal courts after *Booker*.[17] We conclude that reinstating the previous standard of review in Michigan, as a means of determining the reasonableness of a sentence, is preferable to adopting the analysis utilized by the federal courts and is most consistent with the Supreme Court's directives in *Lockridge*. Unlike the federal district courts, Michigan trial courts are not procedurally required to expressly consider all of the factors listed in 18 USC § 3553(a). For example, unlike federal courts, Michigan courts are not expressly required to consider sentences imposed in other cases in order to weigh "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).[18] Instead, under *Lockridge*, sentencing courts are only required "to consult the applicable guidelines range and take it into account when imposing a sentence . . . [and] justify the sentence imposed in order to facilitate appellate review." *Lockridge*, ___ Mich at ___; slip op at 29. As such, it would be unworkable to expect this Court to review a sentence for an abuse of discretion based on the factors under § 3553(a) when the trial court was not required to expressly consider these factors in determining a reasonable sentence. Moreover, unlike the United States Sentencing Commission, the Legislature does not issue policy statements under the statutory sentencing scheme, MCL 777.1 *et seq*., such that it is effectively impossible for a trial court or this Court to consider a factor analogous to § 3553(a)(5) in order to determine whether a sentence is reasonable. Furthermore, although the majority opinion in *Lockridge* expressly cites *Booker*, 543 US at 261, the opinion includes no discussion of § 3553(a) and the significant role of that statutory provision in the analysis employed by federal appellate courts in determining the reasonableness of a sentence. See *Lockridge*, ___ Mich at ___; slip op at 29. Therefore, we hold that a sentence that fulfills the principle of proportionality under *Milbourn* and its progeny constitutes a reasonable sentence under *Lockridge*.

---

[17] Justice Markman noted in his *Lockridge* dissent that the post-severability analysis standard utilized by the United States Supreme Court under *Booker*, 543 US at 246, is consistent with Michigan's previous standard of review under *Milbourn*, 435 Mich at 636. *Lockridge*, ___ Mich at ___; slip op at 61 n 40 (MARKMAN, J., dissenting). This conclusion is further supported by the fact that the Sixth Circuit and other circuits have "applied a proportionality principle based on at least two of the § 3553(a) factors." *United States v Poynter*, 495 F3d 349, 352 (CA 6, 2007); see also *id*. at 355-359.

[18] Cf. *United States v Begin*, 696 F3d 405, 413-414 (CA 3, 2012) (explaining that a federal district court erred in failing to consider the defendant's argument regarding § 3553(a)(6)).

Given that *Lockridge* overturned the substantial and compelling reason standard, *Lockridge*, ___ Mich at ___; slip op at 29, which was in place at the time of defendant's sentencing, and given our conclusion that the principle of proportionality established under *Milbourn* and its progeny is now the appropriate standard by which a defendant's sentence should be reviewed, we also find that the procedure articulated in *Lockridge*, and modeled on that adopted in *United States v Crosby*, 397 F3d 103 (CA 2, 2005), should apply here. *Lockridge*, ___ Mich at ___; slip op at 33-36. As recently stated by this Court in *People v Stokes*, ___ Mich App ___, ___; ___NW2d ___ (2015); slip op at 11, "the purpose of a *Crosby* remand is to determine what effect *Lockridge* would have on the defendant's sentence, so that it may be determined whether any prejudice resulted from the error." While the *Lockridge* Court did not explicitly hold that the *Crosby* procedure applies under the circumstances of this case, we conclude this is the proper remedy where, as here, the trial court was unaware of and not expressly bound by a reasonableness standard rooted in the *Milbourn* principle of proportionality at the time of sentencing.

Under the *Crosby* procedure, which "offers a measure of protection to a defendant[,]" "a defendant is provided with an opportunity 'to avoid resentencing by promptly notifying the trial judge that resentencing will not be sought.' " *Stokes*, ___ Mich App at ___; slip op at 11-12, quoting *Lockridge*, ___ Mich at___; slip op at 35. Given the possibility that defendant could receive a more severe sentence, defendant should be provided the opportunity to avoid resentencing if that is his desire. *Stokes*, ___ Mich App at ___; slip op at 12. Accordingly, we remand the matter to the trial court to follow the *Crosby* procedure outlined in *Lockridge*. Defendant "may elect to forego resentencing by providing the trial court with prompt notice of his intention to do so. If 'notification is not received in a timely manner,' the trial court shall continue with the *Crosby* remand procedure as explained in *Lockridge*." *Stokes*, ___ Mich App at ___; slip op at 12, quoting *Lockridge*, ___ Mich at ___; slip op at 35-36.

We affirm defendant's convictions, but remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Kurtis T. Wilder
/s/ Donald S. Owens
/s/ Michael J. Kelly

-25-