# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 2, 2017

Plaintiff-Appellee,

v

No. 329764
Macomb Circuit Court
LC No. 2014-003647-FH

DAVON RAPHEL CHUNN,

Defendant-Appellant.

Before: JANSEN, P.J., and BECKERING and GADOLA, JJ.

PER CURIAM.

Defendant, Davon Raphel Chunn, appeals as of right his jury trial convictions for unlawful imprisonment, MCL 750.349b, and three counts of assault with a dangerous weapon (felonious assault), MCL 750.82. The trial court sentenced defendant, as a second habitual offender, MCL 769.10, to 48 to 180 months' imprisonment for the unlawful imprisonment conviction and 12 to 72 months' imprisonment for each of the felonious assault convictions.[1] On appeal, defendant challenges his convictions and the scoring of offense variable (OV) 1 and OV 3. We affirm.

## I. BASIC FACTS

This case arises out of an incident that took place at a senior living apartment building in Mt. Clemens on June 21, 2014. Defendant and his girlfriend, Shanna Dobbs, visited Dobbs's aunt on the second floor of the apartment building. Brandon Ballentine and Jalisa Patterson accompanied defendant and Dobbs. At around 9:00 p.m., the four left the apartment of Dobbs's aunt, and they used the stairwell to get to the apartment lobby. At the same time, many of the senior residents in the building were in the lobby area of the apartment building. Ann Mihlader, Gloria Carlson, Joetta Carey, and Kristine Fisher, all senior residents, were in the lobby of the apartment building, and they were getting ready to head back to their apartments. Louise Biange

---

[1] Defendant was charged with four counts of felonious assault. The jury found defendant guilty on three counts of felonious assault against Ann Mihlader, Margaret Bartoski, and Joetta Carey, and not guilty on one count of felonious assault against Louise Biange.

and Margaret Bartoski were cleaning up a multi-purpose room adjoining the lobby. Sherman Fisher was in a wheelchair near the entrance of the lobby.

The residents watched as defendant entered the lobby from the stairwell with a fire extinguisher in his hand. As the doors to the stairwell opened, witnesses heard someone yelling, "fire, fire, happy birthday, fire." The residents testified that defendant started spraying the fire extinguisher, filling the lobby with a thick smoke. The senior residents testified that the smoke was so thick that they were having a hard time breathing. A number of the residents attempted to exit out the front entrance, but Ballentine held the doors shut. The residents could hear defendant and Ballentine laughing. Carlson testified that defendant sprayed her in the face, and her eyes, chest, and lungs instantly felt like they were on fire. Bartoski was also sprayed directly in the face. Mihlader asked defendant why he was doing this, and in response, defendant said, "shut up, God damn bitch, just shut up." According to Carey, defendant also told her, "shut up, bitch," and the smoke started to burn her eyes, mouth, and throat. Eventually, Ballentine let the doors go, and defendant and Ballentine ran to Dobbs's vehicle in the parking lot and drove off. The senior residents finally exited the building as paramedics, the fire department, and law enforcement were arriving. The fire department administered oxygen to many of the senior residents. Carlson and Bartoski, having been sprayed directly in the face, were put on an I.V. and rushed to the hospital. They spent approximately four days in the hospital.

## II. ANALYSIS

### A. "OTHER ACTS" TESTIMONY

Defendant first argues that he is entitled to a new trial because Biange provided impermissible "other acts testimony" during the prosecution's questioning. The direct examination of Biange that produced the testimony to which defendant objects proceeded as follows:

> [*Prosecutor*]: Has this incident affected you emotionally?
>
> [*Biange*]: Definitely.
>
> *Prosecutor*: How so?
>
> *Biange*: Fear. You are living in a senior complex thinking you will be safe in a senior complex and and [sic] you have something like this happen. Now it is like you are constantly looking behind your back. You are afraid to go out and do anything. *I walked down the road one day and that vehicle they got out in tried to hit* [*Bartoski*].
>
> *Prosecutor*: How has this affected you and your friend [Bartoski] emotionally?
>
> *Biange*: Very greatly.
>
> *Prosecutor*: Has her personality changed?

-2-

> *Biange*:  Definitely.

> *Prosecutor*:  How so?

> *Biange*:  She is very skittish, jumpy, very quiet.  She is more to herself now.  When she first moved in she was more outgoing.

> *Prosecutor*:  So you noticed a change before the fire extinguisher and after with your friend?

> *Biange*:  Yes.

The "other acts" evidence at issue is the italicized sentence in Biange's testimony, wherein it appears that Biange was describing an event that occurred after the incident in question involving Dobbs's vehicle.

Contrary to defendant's contention in his brief on appeal, his trial counsel did not contemporaneously object to the testimony.  Rather, the record reflects that defense counsel waited until after his cross-examination of Biange and the testimony of two additional witnesses before he called for a side bar conference.  Thereafter, two more witnesses testified.  At that point, the trial court made a record of what was discussed during the side bar discussion pertaining to Biange's remark.  The trial court agreed that the testimony was improper, noted that "any number of objections could have come at that point," and acknowledged defense counsel's desire not to highlight the testimony in front of the jury; as such, the trial court deemed the objection to be preserved.  The prosecutor noted that Biange's testimony was unresponsive to his question and that he immediately redirected the witness and did not follow up on what she said. He further pointed out that Biange's remark did not mention defendant.  The trial court noted that among the remedial options for improperly admitted testimony are a jury limiting instruction or a mistrial, although the court did not weigh in on whether the testimony called for a mistrial. It is apparent from the record that defense counsel did not want to want to highlight the stray remark with a jury instruction.  There is no indication in the record, nor does defendant contend on appeal, that he asked for a mistrial.

On appeal, it is not quite clear from defendant's brief the grounds upon which he seeks a new trial.  Citing the abuse of discretion standard, defendant appears to argue that it was an abuse of discretion for the trial court to admit the other acts evidence, which defendant contends was also unduly prejudicial under MCR 403.  However, the trial court did not weigh in on the admissibility of the evidence prior to its admission because it was an unsolicited remark by a witness, and the trial court, along with the parties, agreed that the remark had been improperly given by the witness.

To the extent defendant is claiming a mistrial should have been granted, the grant or denial of a mistrial based on an error in the testimony of a witness is reviewed for an abuse of discretion.  See *People v Nash*, 244 Mich App 93, 96; 625 NW2d 87 (2000).  "This Court will find an abuse of discretion if the trial court chose an outcome that is outside the range of principled outcomes." *People v Schaw*, 288 Mich App 231, 236; 791 NW2d 743 (2010).

A mistrial should only be granted when there is an irregularity in the trial that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial. *People v Lane*, 308 Mich App 38, 60; 862 NW2d 446 (2014). Generally, "unresponsive testimony by a prosecution witness does not justify a mistrial unless the prosecutor knew in advance that the witness would give the unresponsive testimony or the prosecutor conspired with or encouraged the witness to give that testimony." *People v Jackson (On Reconsideration)*, 313 Mich App 409, 427; 884 NW2d 297 (2015), quoting *People v Hackney*, 183 Mich App 516, 531; 455 NW2d 358 (1990). "A mistrial should be granted only where the error complained of is so egregious that the prejudicial effect can be removed in no other way." *People v Gonzales*, 193 Mich App 263, 266; 483 NW2d 458 (1992).

Here, we conclude that the trial court did not abuse its discretion in failing to declare a mistrial—although we again note that it is not apparent from the record that defendant even asked for a mistrial. First, there is no indication that the prosecutor knew in advance that the witness would give the unresponsive testimony or conspired with or encouraged the witness to give that testimony. Biange's testimony was unresponsive to the question asked, which expressly pertained to "the incident" at issue. The prosecutor immediately redirected the witness to answer the question he did ask, and did not follow-up on or ask the witness to elaborate on what she meant by her response.

Second, the unsolicited remark was brief and not so egregious that the prejudicial effect could not be removed. Importantly, "unresponsive answers may work a certain amount of mischief with the jury, but they are generally not considered prejudicial errors unless egregious or not amenable to a curative instruction." *People v Mahone*, 294 Mich App 208, 213; 816 NW2d 436 (2011) (quotation marks and citation omitted). In *Mahone*, this Court determined that unresponsive testimony from a police officer "could easily have been struck, [but] defense counsel did not make a request to strike, possibly because at that point, it would simply have drawn more attention to the statement." *Id*. Here, as in *Mahone*, the trial court noted that Biange's statement could have been struck from the record, but defense counsel did not want to highlight the testimony in front of the jury. The trial court stated, "I understand you did not object to it at the time and you do not want to highlight that kind of statement in front of the jury . . . ." For that reason, the trial court did not give a curative instruction, although it could have. Moreover, the statement was not so egregious that an instruction could not have cured the error. It was a stray remark that was brief, did not reference defendant, and was never elaborated upon or addressed again. Therefore, the trial court's failure to declare a mistrial was within the range of reasonable and principled outcomes and does not amount to an abuse of discretion. For this same reason, we also reject defendant's contention that he was denied due process or a fair trial.

## B. JURY INSTRUCTION

Defendant's next argument is that the trial court should not have read a flight instruction to the jury because there was no evidence of flight at trial. We disagree.

"[A] trial court's determination whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006) (quotation marks and citation omitted). "A trial court abuses its discretion when it selects an outcome that does not fall within the range of reasonable and principled outcomes." *People v*

*Snyder (On Remand)*, 301 Mich App 99, 104; 835 NW2d 608 (2013) (quotation mark and citation omitted).

"[J]ury instructions must include all the elements of the charged offenses and any material issues, defenses, and theories that are supported by the evidence." *People v Pinkney*, ___ Mich App ___; ___ NW2d ___ (Docket No. 325856); slip op at 9 (2016) (quotation marks and citation omitted). "[E]vidence of flight is admissible to support an inference of consciousness of guilt and the term flight includes such actions as fleeing the scene of the crime." *People v Unger*, 278 Mich App 210, 226; 749 NW2d 272 (2008) (quotation marks and citation omitted). While defendant argues that there must be some evidence that he feared apprehension before the trial court can read a flight instruction, our Supreme Court has held that a "prosecutor is not required to prove that [the defendant] left the jurisdiction because he was 'motivated' by fear of apprehension. If that was required, flight evidence would rarely be admissible because it is obviously difficult to prove somebody's motives." *People v Smelley*, 485 Mich 1023, 1023; 776 NW2d 310 (2010).[2] The jury must determine "whether evidence of flight occurred under such circumstances as to indicate guilt." *Unger*, 278 Mich App at 226.

Defense counsel objected to the jury instruction on flight, which read as follows:

> There has been some evidence that [defendant] tried to run away after the alleged crime. This evidence does not prove guilt. A person may run or hide for innocent reasons such as panic, mistake or fear. However, a person may also run or hide because of a consciousness of guilt. You must decide whether the evidence is true and if true, whether or not it shows [defendant] had a guilty state of mind.

After defendant objected, the trial court explained that a flight instruction is proper when "there is some evidence of flight," and it determined that "there was some testimony that indicated that [defendant] essentially got into a car afterwards and left the scene." The trial court did not abuse its discretion, as the decision was not outside a range of reasonable and principled outcomes.

At trial, one of the senior residents stated that defendant "ran out of the building laughing and through [sic] the fire extinguisher on the ground when [he] saw the police coming." Another witness testified that defendant and Ballentine "ran down the sidewalk to the end of the parking lot and got into this car where the two girls were driving in." The witness said, "They took off. And one of the residents tried to run after to stop them but they, you know, slid down in the seat so they -- he didn't know what car they got into." Finally, another witness watched as the four people, including defendant, drove off. There was also testimony that the police, fire

---

[2] Defendant relies on *People v Hall*, 174 Mich App 686, 691; 436 NW2d 446 (1989), for the claim that there must be evidence that he "feared apprehension" before the trial court can read a flight instruction to the jury. However, *Hall*, decided in 1989, is not precedentially binding. MCR 7.215(J)(1). In light of our Supreme Court's decision in *Smelley*, a prosecutor need not show that the defendant feared apprehension before a jury instruction on flight is given. *Smelley*, 485 Mich at 1023.

department, and paramedics were on the scene as the senior residents made it out of the building, further showing that defendant was leaving as law enforcement was arriving. In light of this testimony, we conclude that there was adequate evidence of flight, and the trial court did not abuse its discretion when it read the flight instruction.

## C. OFFENSE VARIABLES

Defendant also argues that the trial court erred when it assessed 20 points for OV 1 and 25 points for OV 3 at sentencing. We disagree.

Generally, the circuit court's factual determinations are reviewed for clear error and need only be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute is a question of statutory interpretation, which this Court reviews de novo. *People v Steanhouse*, 313 Mich App 1, 38; 880 NW2d 297 (2015). This Court also reviews de novo, as a question of law, the proper interpretation of the sentencing guidelines. *People v Gullett (On Remand)*, 277 Mich App 214, 217; 744 NW2d 200 (2007).

### 1. OV 1

Defendant first argues that the trial court erred in its assessment of OV 1 at 20 points. OV 1 assesses points for "aggravated use of a weapon." MCL 777.31(1). In relevant part, the statute provides:

> (1) Offense variable 1 is aggravated use of a weapon. Score offense variable 1 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:
>
> * * *
>
> (b) The victim was subjected or exposed to a harmful biological substance, harmful biological device, harmful chemical substance, harmful chemical device, harmful radioactive material, harmful radioactive device, incendiary device, or explosive device . . . 20 points
>
> * * *
>
> (3) As used in this section:
>
> (a) "Chemical irritant", "chemical irritant device", "harmful biological substance", harmful biological device", "harmful chemical substance", "harmful chemical device", "harmful radioactive material", "harmful radioactive device", and "imitation harmful substance or device" mean those terms as defined in section 200h of the Michigan penal code, 1931 PA 328, MCL 750.200h. [MCL 777.31(1)(b) and (3)(a).]

MCL 750.200h defines "chemical irritant" and "harmful chemical substance" as follows:

(a) "Chemical irritant" means a solid, liquid, or gas that through its chemical or physical properties, alone or in combination with 1 or more other substances, can be used to produce an irritant effect in humans, animals, or plants.

\* \* \*

(i) "Harmful chemical substance" means a solid, liquid, or gas that through its chemical or physical properties, alone or in combination with 1 or more other chemical substances, can be used to cause death, injury, or disease in humans, animals, or plants. [MCL 750.200h(a) and (i).]

Defendant argues on appeal that OV 1 should have been assessed at zero points because the fire retardant from a fire extinguisher does not fit within any of the categories under MCL 777.31(1)(b). As support, defendant cites *People v Blunt*, 282 Mich App 81, 87-89; 761 NW2d 427 (2009), where this Court held that hot cooking oil was not a "harmful chemical substance" because cooking oil did not "possess an inherent or intrinsic ability or capacity to cause death, illness, injury or disease" because the victim did not sustain injury "through [the] chemical or physical properties of the cooking oil." Defendant's argument is unavailing.

To support a conviction for felonious assault, the jury, as fact-finder, necessarily found that the evidence presented at trial proved beyond a reasonable doubt that defendant possessed some type of dangerous weapon while assaulting another person. MCL 750.82. At the conclusion of the trial, the jury was instructed to determine whether a fire extinguisher constituted a dangerous weapon before it could determine whether defendant was guilty beyond a reasonable doubt of felonious assault. The jury did find defendant guilty on three counts of felonious assault, and therefore, the jury necessarily determined that the fire extinguisher, as used by defendant, was a dangerous weapon. Additionally, the trial court determined at sentencing that OV 1, which mandates an assessment of 20 points for the "aggravated use of a weapon," applied because the fire retardant was a "harmful chemical substance" under MCL 777.31(1)(b).

This Court has not determined whether a fire retardant expelled from a fire extinguisher constitutes a "harmful chemical substance" as is defined under MCL 750.200h. We hold that the fire retardant in this case was a harmful chemical substance because it can cause death, illness, injury or disease through its chemical or physical properties. Fire extinguishers are common items found in homes and public buildings, but unlike cooking oil, fire retardant possesses an "intrinsically dangerous, noxious, or pernicious qualit[y]." *Blunt*, 282 Mich App at 88. This is evidenced by the fact that two senior residents needed an I.V., oxygen, and approximately four days in the hospital to recover from being sprayed in the face with the fire retardant. Paramedics also had to administer oxygen to other senior residents on site, and many of those residents vomited because they inhaled the fumes. Some of the witnesses even testified that over a year after the incident they continue to suffer from having inhaled the fire retardant. One witness said that she continues to spit up and her "eyes get pussed up and seal shut." Another witness now requires the use of medicinal eye drops. With that said, fire retardant—a chemical designed to extinguish fire—is not like cooking oil.

In *Blunt*, 282 Mich App at 88, this Court held that the cooking oil was made dangerous by an intervening cause, i.e., heating the oil, and it was not the Legislature's intent to include in

the definition section of the statute all substances made dangerous by external forces. Rather, the chemical substance must be harmful "through its chemical or physical properties," making them "intrinsically dangerous." *Id*. at 87-88; see also MCL 750.200h. The evidence showed that the victims sustained injury when they were simply exposed to the chemical properties of the fire retardant. Thus, the fire retardant is a "harmful chemical substance" under MCL 750.200h, the evidence showed that the residents had been subjected to that harmful chemical substance, and therefore, the trial court did not err when it assessed OV 1at 20 points.

### 2. OV 3

Defendant also argues that the trial court erred because it engaged in judicial fact-finding to assess 25 points for OV 3. We disagree.

OV 3 considers the extent of injury to a victim. MCL 777.33. This provision states, in relevant part:

> (1) Offense variable 3 is physical injury to a victim. Score offense variable 3 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:
>
> * * *
>
> (c) Life threatening or permanent incapacitating injury occurred to a victim . . . 25 points

The trial court assessed 25 points because it found that the victims in this case suffered permanent incapacitating injuries. Defendant claims that the trial court erred because it engaged in impermissible judicial fact-finding by concluding that the victims suffered permanent incapacitating injury even though the jury made no such finding, and that the trial court's use of judicially found facts increased defendant's sentence. Defendant does not dispute that the court's factual finding was supported by a preponderance of the evidence, nor does he challenge the reasonableness of his sentence. Defendant's only basis for challenging OV 3 is that its assessment required judicial fact-finding, and a trial court, when calculating a minimum guidelines range, is not allowed to find facts beyond those admitted by a defendant or found by a jury. This argument fails.

In *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), our Supreme Court did not eliminate the ability for sentencing courts to engage in judicial fact-finding. The constitutional violation addressed by the *Lockridge* Court was not judicial fact-finding per se, but "the extent to which the [sentencing] guidelines *require* judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables (OVs) that *mandatorily* increase the floor of the guidelines minimum sentence range . . . ." *Lockridge*, 498 Mich at 364. The Court's remedy was not to prohibit the use of judge-found facts to score offense variables, but to make a sentencing guidelines range scored using judicially found facts advisory rather than mandatory. *Id*. Sentencing courts are still required to assess the highest number of points possible for all OVs, "whether using judge-found facts or not," *id*. at 392 n 28, and to "consult the applicable guidelines range and take it into account when imposing a sentence." *Id*. at 392. As such,

defendant's argument that the trial court impermissibly engaged in judicial fact-finding to assess 25 points for OV 3 is without merit.[3]

Affirmed.

/s/ Kathleen Jansen
/s/ Jane M. Beckering
/s/ Michael F. Gadola

---

[3] We further note that defendant is not entitled to a remand for a procedure as set forth in *United States v Crosby*, 397 F3d 103(CA, 2005), because defendant was sentenced after July 29, 2015, the date *Lockridge* was issued, and, in fact, the trial court acknowledged that the sentencing guidelines were only advisory. See *Lockridge*, 498 Mich at 395-399.