# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

DAVID TROY ZARN,

       Defendant-Appellant.

UNPUBLISHED
March 27, 2018

No. 323279
Wayne Circuit Court
LC No. 13-008592-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

DAVID TROY ZARN,

       Defendant-Appellant.

No. 323280
Wayne Circuit Court
LC No. 13-008758-FC

---

ON REMAND

Before: K. F. KELLY, P.J., and FORT HOOD and BORRELLO, JJ.

PER CURIAM.

This case returns to us on remand from the Michigan Supreme Court. After initially holding this matter in abeyance, the Michigan Supreme Court has remanded this case to us for "plenary review of the defendant's claim that his sentence was disproportionate under the standard set forth in *People v Milbourn*, 435 Mich 630, 636 [; 461 NW2d 1 (1990)]. See *People v Steanhouse*, [500 Mich 453, 460-461; 902 NW2d 327 (2017)]." For the reasons set forth below, we affirm defendant's sentences but remand for the ministerial purpose of allowing the trial court to correct the judgment of sentence.

## I. BACKGROUND

In our earlier opinion, we set forth the pertinent facts underlying this appeal:

-1-

This case arises from allegations of prolonged sexual abuse by defendant against his stepdaughters, T.S. and L.S. Defendant married the complainants' mother . . . in 2000, shortly after [she] divorced the complainants' biological father[.] The complainants lived in Michigan with defendant and [their mother] until 2006, at which point [their mother], defendant, and the complainants moved to Pennsylvania. Complainants testified at trial that defendant sexually abused them while they lived in both Michigan and Pennsylvania. Both complainants testified that the abuse in Michigan included defendant forcing complainants to perform oral sex on him. In 2012, T.S. told her boyfriend about the abuse, which ultimately led to an investigation, during which both complainants disclosed abuse. The case proceeded to trial, and defendant was convicted of all charged crimes, which he now appeals. [*People v Zarn*, unpublished per curiam opinion of the Court of Appeals, issued March 22, 2016 (Docket Nos. 323279, 323280), p 2.]

We also noted the procedural history of these consolidated appeals in our earlier opinion:

In [D]ocket number 323279, defendant appeals as of right his jury trial convictions of three counts of first-degree criminal sexual conduct (CSC I), MCL 750.520b(1)(a) (person under 13 years of age), and second-degree criminal sexual conduct (CSC II), MCL 750.520c(1)(a) (person under 13 years of age). Defendant was sentenced to 30 to 70 years' imprisonment for the CSC I convictions to be served consecutive to 15 to 25 years' imprisonment for the CSC II conviction. In [D]ocket number 323280, defendant appeals as of right his jury trial conviction of CSC I, MCL 750.520b(1)(a) (person under 13 years of age). Defendant was sentenced to 30 to 70 years' imprisonment for the CSC I conviction. These cases were consolidated for the efficient administration of the appellate process. [*Zarn*, unpub op at 1 (footnote omitted).]

In this Court, defendant advanced several arguments challenging his sentences, the trial court's evidentiary rulings, and also alleged prosecutorial misconduct, ineffective assistance of counsel and judicial bias. In our first opinion we affirmed defendant's convictions, but remanded for a *Crosby*[1] hearing with respect to his sentences. *Id.* at 1-2. Specifically, in this Court, defendant had argued that he was entitled to be resentenced where the trial court engaged in impermissible judicial fact-finding in violation of the Sixth Amendment in assessing points pursuant to the sentencing guidelines. *Id.* at 2. Defendant also challenged the trial court's scoring of several offense variables (OVs), and asserted that the trial court lacked substantial and compelling reasons to depart upward from the sentencing guidelines. *Id.* at 2, 4. While we acknowledged in our first opinion that the jury did not make findings necessary to support the scoring of points for OV 13 (physical injury), OV 4 (psychological injury), OV 10 (predatory behavior), and OV 13 (continuing pattern of criminal behavior), we also observed that, congruent with the Michigan Supreme Court's holding in *People v Lockridge*, 498 Mich 358; 870 NW2d

---

[1] *United States v Crosby*, 397 F3d 103 (CA 2, 2005).

502 (2015), "defendants who received an upward departure sentence could not establish plain error because the trial court did not rely on the minimum sentence range." *Zarn*, unpub op at 3. We further acknowledged the Michigan Supreme Court's directive in *Lockridge* that "a sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *Id.*, citing *Lockridge*, 498 Mich at 392. At the time of our first opinion, the governing precedent directing our "reasonableness" review was this Court's decision in *People v Steanhouse*, 313 Mich App 1; 880 NW2d 297 (2015), rev'd on other grounds 500 Mich at 460. Thus, pursuant to this Court's decision in *Steanhouse*, we remanded this case to the trial court for a *Crosby* hearing as outlined in *Lockridge*. *Zarn*, unpub op at 1-2, 3, 4.

Defendant subsequently applied for leave to appeal to the Michigan Supreme Court, and on March 7, 2017, the Michigan Supreme Court entered an order holding these appeals in abeyance pending its decisions in *Steanhouse* and *People v Masroor*, 500 Mich 453. *People v Zarn*, ___ Mich ___; 890 NW2d 662 (2017). Subsequently, on November 29, 2017, the Michigan Supreme Court entered an order remanding these appeals to this Court, stating as follows:

> By order of March 7, 2017, the application for leave to appeal the March 22, 2016 judgment of the Court of Appeals was held in abeyance pending the decisions in *People v Steanhouse* (Docket No. 152849) and *People v Masroor* (Docket Nos. 152946-8). On order of the Court, the cases having been decided on July 24, 2017, 500 Mich 453; 902 NW2d 327 (2017), the application is again considered and, pursuant to MCR 7.305(H)(1), in lieu of granting leave to appeal, we REVERSE that part of the judgment of the Court of Appeals remanding this case to the trial court for a hearing pursuant to *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), and we REMAND this case to the Court of Appeals for plenary review of the defendant's claim that his sentence was disproportionate under the standard set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990). See *People v Steanhouse*, 500 Mich 453, 460-461; 902 NW2d 327 (2017). In all other respects, leave to appeal is DENIED, because we are not persuaded that the remaining questions presented should be reviewed by this Court. [*People v Zarn*, 501 Mich 921; 903 NW2d 554 (2018).]

After defendant moved for reconsideration in the Michigan Supreme Court, the Michigan Supreme Court issued an order on February 20, 2018 denying defendant's motion. *People v Zarn*, ___ Mich ___; 906 NW2d 760 (2018).

## II. ANALYSIS

Pursuant to the Michigan Supreme Court's directive, we must give "plenary review" to defendant's allegation "that his sentence was disproportionate under the standard set forth in *People v Milbourn*, 435 Mich 630, 636 (1990)." *People v Zarn*, ___ Mich ___; 903 NW2d 554 (2018). In its order, the Michigan Supreme Court directed us to its recent decision in *People v Steanhouse*, 500 Mich at 460-461. In *Steanhouse*, the Michigan Supreme Court held that "the proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the 'principle of proportionality' set forth in [*Milbourn*], 'which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances

surrounding the offense and the offender.'" *Id*. at 460-461. In *Steanhouse*, the Michigan Supreme Court also clarified that where a defendant receives an upward departure sentence, pursuant to *Lockridge*, the defendant is unable to show prejudice arising from any alleged error in violation of the Sixth Amendment, and therefore "the proper approach is for the Court of Appeals to determine whether the trial court abused its discretion by violating the principle of proportionality." *Id*. at 461.

In *Steanhouse*, the Michigan Supreme Court recalled its prior opinion in *Lockridge*, noting that departure sentences following *Lockridge* "would be reviewed for reasonableness[.]" *Id*. at 462. Therefore, post-*Steanhouse*, when reviewing a defendant's sentence for reasonableness, the applicable standard of review to be used by appellate courts is an abuse of discretion. *Id*. at 471. Moreover, the principle of proportionality standard requires this Court to discern whether a sentence imposed by the trial court is "proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Id*. at 474, quoting *Milbourn*, 435 Mich at 636. The *Steanhouse* Court held, in pertinent part, as follows:

> We repeat our directive from *Lockridge* that the guidelines "remain a highly relevant consideration in a trial court's exercise of sentencing discretion" that trial courts " 'must consult' " and " 'take . . . into account when sentencing,' " *Lockridge*, 498 Mich at 391, quoting [*United States v Booker*, 543 US 220, 264; 125 S Ct 738; 160 L Ed 2d 621 (2005)] and our holding from *Milbourn* that "the key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines recommended range," *Milbourn*, 435 Mich at 661. [*Steanhouse*, 500 Mich at 474-475.]

The following factors are of assistance in determining whether a departure sentence "is more proportionate than a sentence within the guidelines range[.]" *People v Dixon-Bey*, ___ Mich App ___, ___: ___ NW2d ___ (2017) (Docket No. 331499); slip op at 18. Such factors include:

> (1) whether the guidelines accurately reflect the seriousness of the crime, *People v Houston*, 448 Mich 312, 321-322; 532 NW2d 508 (1995), see also *Milbourn*, 435 Mich at 657 (2) factors not considered by the guidelines, *Houston*, 448 Mich at 322–324, see also *Milbourn*, 435 Mich at 660 and (3) factors considered by the guidelines but given inadequate weight[.] [*Dixon-Bey*, ___ Mich App at ___; slip op at 18-19.]

Other relevant factors include, "the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation[.]" *Id*. at ___; slip op at 19 n 9, quoting *Steanhouse*, 313 Mich App at 46.

A. FACTORS CONSIDERED BY THE TRIAL COURT DURING SENTENCING

For defendant's CSC I convictions, the sentencing guidelines called for a minimum sentence in the range of 135 to 225 months' imprisonment. For defendant's CSC II conviction, the guidelines recommended a minimum sentence in the range of 43 to 86 months' imprisonment. The trial court relied on the following factors in deciding to depart upward from the sentencing guidelines' recommended range: (1) the length of time that T.S. and L.S. endured

sexual abuse by defendant, (2) that, in 2006, after defendant had committed the offenses giving rise to this appeal, the state Legislature amended MCL 750.520b to provide for a potential life sentence, and a mandatory minimum sentence of 25 years, for a conviction of CSC I where the victim is under the age of 13, (3) the emotional and long-lasting damage defendant inflicted on T.S. and L.S.'s family and the irreparable destruction of their relationship with their mother, (4) the fact that while living with defendant and being repeatedly sexually abused, T.S. and L.S. lived a life of isolation subject to defendant's control, (5) that defendant's sexual abuse of T.S. and L.S. violated their parents' trust in him where he acted as a father figure to the children, (6) that both T.S. and L.S. were subject to repetitive violent abuse at defendant's hands, and (7) the fact that both T.S. and L.S. were members of defendant's immediate family, living under his roof when he engaged in the sexual abuse and that he was a father figure to them.

Defendant first challenges the trial court's departure on the basis of the length of time that the sexual abuse transpired, as well as its violent nature. Where these factors also dovetail with the isolation and control that defendant imposed on T.S. and L.S., we will consider this factor as well. According to defendant, the trial court engaged in "double-dipping" when it departed upward on the basis of the length of the abuse, particularly where the trial court assessed 25 points for OV 13, which addresses "a continuing pattern of criminal behavior." MCL 777.43. An assessment of 50 points, which is what defendant received, is appropriate where "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more sexual penetrations against a person or persons less than 13 years of age." MCL 777.43(1)(a). We disagree with defendant that OV 13 adequately takes into account the continuing nature of the violent sexual abuse that defendant inflicted.

For example, during the sentencing hearing, while commenting on the particularly disturbing facts of this "exceptional" sexual abuse case, the trial court remarked that during the lengthy course of sexual abuse, both T.S. and L.S. "lived a life of isolation and control where they weren't even free to bathe." According to the trial court's recitation of the facts:

> [Defendant] monitored [T.S. and L.S.'s] ability to bathe and when they went over his time restrictions in the bathroom he would interfere in the most private basic thing that any human being should be allowed to wash, is their body. [Defendant] wouldn't even allow these girls to wash their bodies without being controlled.

The trial court's comments were supported by the record evidence. The record reflects that defendant started to sexually abuse both T.S. and L.S. at the age of six, forcing them to perform fellatio on him while blindfolded. Defendant also conducted "listening tests" on T.S. as a little girl while she was blindfolded, and if she moved or gagged while performing fellatio, she would be beaten with a belt. During trial, T.S. testified that defendant had strict rules in his home for when she and L.S. could shower. The children could only shower in the master bathroom which defendant shared with their mother, they were not allowed to lock the bathroom doors, they were allotted specific amounts of time within which they could shower and the water had to be turned off as they soaped their bodies. When she was 16 years old, T.S. started to realize that the sexual abuse that she had suffered was not normal or commonplace, specifically stating, "I realized that I wasn't living a life like most teenage girls and I had had enough." T.S. also testified that she was not allowed to have a boyfriend, she and L.S. were not allowed to have friends over to visit,

and that defendant went so far as to monitor when and how she and L.S. could shave their bodies, forcing them to use electric razors, and at one point defendant forced himself on T.S. and shaved T.S.'s vagina for her.

According to T.S. she did not report the sexual abuse to anyone before she told her boyfriend in 2012, because she thought that everyone went through such treatment, and defendant had coerced her into thinking that he was doing it for her benefit. T.S. also testified that she was also afraid to disclose the sexual abuse to anyone else because defendant had physically abused her by beating her with a belt in the past. In T.S.'s own words, "I was afraid to tell because although [defendant] never threatened me saying that he would do something to me[,] through the multiple years of getting hit with a belt I didn't even want to imagine what would happen if [defendant] found out I told someone [about the sexual abuse.]" As noted previously, T.S. also testified about "listening tests" that defendant forced her to undergo when she was six years old where she would be required to stand in front of him naked and blindfolded and perform fellatio on him, and if she flinched when defendant touched her or gagged when he put his penis in her mouth she would be beaten with a belt on her bottom. At the sentencing hearing L.S. also recalled how she was not permitted to participate in sports as much as she wanted to, she was not able to sleep over at her friends' houses or go to birthday parties, and only had one birthday party herself during her childhood. T.S. and L.S.'s father also recalled at trial that he was not permitted to call and speak to his daughters over the telephone unless defendant or the children's mother was at home.

In *People v Smith*, 482 Mich 292, 301; 754 NW2d 284 (2008), the Michigan Supreme Court recognized that where a victim had undergone repeated sexual abuse over a 15 month period, the trial court correctly concluded "that the long period of abuse" warranted an upward departure. Therefore, we agree with the trial court that the sentencing guidelines do not adequately take into account the particularly disturbing facts of this case, and the upward departure was warranted where T.S. and L.S. lived a life of isolation, control and sexual abuse caused by defendant for a period of approximately 10 years.

Defendant also challenges the trial court's decision to depart upward where MCL 750.520b was amended by 2006 PA 169, effective August 28, 2006, and now provides for a potential life sentence, and a mandatory minimum sentence of not less than 25 years, where the violation is committed "by an individual 17 years of age or older against an individual less than 13 years of age." MCL 750.520b(2)(b). According to the trial court, the guidelines did not adequately take into account the seriousness of defendant's conduct where the penalty for CSC I had been increased to a mandatory minimum of 25 years, and defendant's recommended guideline range called for a minimum sentence of 11¼ years to 18¾ years. We agree with the trial court that the guidelines did not "accurately reflect the seriousness of [defendant's crime,]" particularly in light of the legislative amendment, and that an upward departure was appropriate on this basis. While defendant asserts that a violation of the Ex Post Facto Clause of the Michigan and federal constitutions resulted, we turn to our analysis in our first opinion in responding to defendant's contention:

> Defendant next asserts that the trial court violated the Ex Post Facto Clause of the Michigan and federal constitutions. We disagree. The Ex Post Facto Clauses of the United States and Michigan Constitutions bar the retroactive

application of a law if the law: (1) punishes an act that was innocent when the act was committed; (2) makes an act a more serious criminal offense; (3) increases the punishment for a crime; or (4) allows the prosecution to convict on less evidence. *People v Earl*, 495 Mich 33, 37; 845 NW2d 721 (2014). . . . Here, defendant complains of the trial court's reference to MCL 750.520b(2)(b), enacted in 2006 after the crimes were committed, which provides a 25-year minimum sentence for CSC I when the victim is under 13 years old. Contrary to defendant's assertion, the trial court did not apply MCL 750.520b. The prosecutor and trial court merely referenced the change in the law when discussing the trial court's discretion to depart upward from the sentencing guidelines. The trial court stated that the amendment of the statute further illustrated the inadequacy of the sentencing guidelines as applied to this case. The trial court did not follow the law or apply it. Moreover, the trial court still provided reasons for upward departure separate from its reference to MCL 750.520b. Thus, no error occurred. [*Zarn*, unpub op at 5.]

Defendant also challenges the trial court's upward departure on the basis of extreme psychological harm to both T.S. and L.S. and their family unit. In deciding to depart upward on the basis of this factor, the trial court noted that the extreme harm caused to T.S.'s and L.S.'s family was not a factor already adequately contemplated by the guidelines:

> Well I don't know about you all but I think that the psychological impact on this family is clearly demonstrated and born[e] out on this record. You have the testimony of both the complaining witnesses' biological mother as well as their biological father as well as the testimony of the complaining witness[es] that shows that this family has been irretrievably broken and that there has certainly been psychological harm [to the] victims o[r] the family members of these victims in this case that are not at all counted or reflected in the guidelines[.]

> * * *

> I mean the damage to the relationships or the bonds between them as sisters, they've given their testimony about that and, I don't know, I mean the most despicable part about this whole case is [the children's mother] who allowed this man to come into her life and she chose a man over her children.

> * * *

> And then you have [the children's mother] when given an opportunity to make a victim impact statement to the Michigan Department of Corrections, and that's born[e] out in the presentence investigation report, she goes on and on about how great her husband is and how her daughters were known to lie and he'd never do anything to hurt those girls. I mean it's just like a mother's love is the one thing that a child knows for sure. If a child doesn't have anything else in the world they're supposed to have their mother to love them but that bond has been irretrievably broken. When these children grow up and they have children of their own they will probably never have a relationship with their mother which means

-7-

their children will probably never have a relationship with their biological grandmother. [Defendant's] action [are] going to have a generational impact on these children and whatever children they have in the future and I don't think there's any words that can express what that must be like to these two little girls to know that their own mother, the one person who brought you into this world, doesn't have their back and didn't love and support them and I don't think that in any way is reflected in these guidelines.

While defendant challenges the trial court's reasoning in this regard, arguing that the "generational impact" of defendant's actions on T.S. and L.S.'s relationship with their mother is "speculative," we disagree with this assertion. The trial court's findings were certainly objective where they could be verified by reference to the record. *Smith*, 482 Mich at 301. For example, during her testimony at the sentencing hearing, T.S. described how defendant "is the one that took away my biological mother, the one that I thought loved me unconditionally and would stand by my side but instead she stands beside [defendant]. This alone has messed me up." When L.S. testified at the sentencing hearing she described the pain from the sexual abuse, and that she refuses to talk to T.S. about it, and how she feels guilty for not protecting her older sister from defendant. According to L.S., she and T.S. "have drifted apart a lot[,]" and where they used to be best friends, they "barely talk anymore." T.S. also characterized her relationship with L.S. as "broken" following the sexual abuse.

Recalling defendant and her mother's wedding anniversary, L.S. stated "[t]o me on their anniversary it's just a day that my own mother, the mother who gave birth to me, officially decided that she wanted to be with [defendant] and not us when it came down to it." According to L.S., her mother told her that she would make L.S.'s life "a living hell" if defendant left her following the disclosure of the sexual abuse. L.S. also testified that she and her mother "barely talk anymore and I have a hard time with relationships with anyone and everyone." In L.S.'s words, "[y]es, [defendant] is the one who abused me and broke me but [my mother] broke my heart and it's all his fault." Describing how she has cut and burned herself on purpose following the abuse, as well as attempted suicide, L.S. also recalled how she was scared to tell anyone about the abuse and that her own mother "turned her back on me and my sister and proved that she never loved me; that she didn't care about me or my safety." During the sentencing hearing, T.S.'s and L.S.'s father described how painful it was for each child to have to take the stand and testify and see members of their family, "who they thought loved them[,]" look at the children, shake their heads and express their disbelief of their testimony. According to their father, it amounted to "re-victimizing [the children] again and again."

OV 4 contemplates "psychological injury to a victim[,]" and the trial court scored 10 points for "[s]erious psychological injury requiring professional treatment [having] occurred to a victim[,]" MCL 777.34(1)(a). OV 5 addresses "psychological injury to a member of a victim's family[,]" and provides for 15 points to be assessed where "[s]erious psychological injury requiring professional treatment occurred to a victim's family[.]" MCL 777.35(1); (1)(a). In this case, the psychological devastation defendant's actions caused to T.S.'s and L.S.'s family, particularly their strained relationships with each other, their broken relationship with their mother after she sided with defendant, and the long-lasting impact to both T.S. and L.S. as a result, were factors not adequately contemplated by the guidelines. See *People v Lawhorn*, 320 Mich App 194, 210-211; ___ NW2d ___ (2017) (observing that factors not adequately accounted

for in OV 4 may be the basis for an upward departure sentence); *People v Michael Anderson*, 298 Mich App 178, 189; 825 NW2d 678 (2012) (noting that "[a]lthough OV 4 accounts for psychological injuries suffered by victims, it does not adequately consider the ways in which an offense affects familial relationships, nor does it always account for the unique psychological injuries suffered by individual victims[.]")

Finally, in departing upward from the recommended guidelines range, the trial court noted that defendant had violated the trust of T.S. and L.S.'s parents, as well as the children themselves, by sexually abusing the children in their own home, within the family unit, while posing as a father figure to them. We agree with the trial court that the sentencing guidelines do not adequately address such circumstances. As the trial court noted during its bench ruling, in *People v Armstrong*, 247 Mich App 423, 425; 636 NW2d 785 (2001), this Court observed that the sentencing guidelines do not "take into account the violation of the [victims'] parents' trust in [the] defendant, the effect on the family occasioned by the victim's loss of trust in all men, including his own father, or the effect on the victim and his sister about having to learn about sexual matters at such a young age." Likewise, in this case, T.S. testified that "[w]hen it comes to family members I push them away[.]" L.S. described how she cannot trust anyone anymore, even the members of her family that she should trust the most. L.S. noted that she is now paranoid after being sexually abused by defendant, and that "[e]very time I turn around I see [defendant's] face." In L.S.'s own words:

> I look at a guy walking down the street and he looks like [defendant]. I watch a [television] show and a guy looks like [defendant]. Sometimes I have a fear of going out in public because I feel I'll see him, not [defendant] himself but his face and that's enough to scare me. I see [defendant] everywhere. All of the abuse has made me paranoid about everything.

L.S. also stated that defendant started sexually abusing her when she was six and "just under 4 feet tall and less than 50 pounds[.]" According to L.S., defendant started the sexual abuse when L.S. was a "powerless little girl" so that he could manipulate her when she was so young, and would be "clueless" and think that the sexual abuse was normal. When testifying about the impact of defendant's actions on himself and the family, T.S. and L.S.'s father stated as follows:

> You have taken from my girls . . . for the last time. They will never be the kids that I remember them to be. As this whole ordeal has taken away their innocence I'm not too sure I will get back the same loving little girls that I once had, the one[s] that were truly happy from the inside out. Now it's more of a show for people around them. As a dad I have no way of making their pain, anger and hatred and other feelings they have go away. These girls need and deserve a sincere apology from your [sic] [defendant], and everyone else that stood by your side, tha[n] maybe, just maybe, they can start to heal.

Additionally, while the trial court recognized that defendant, acting as a father to T.S. and L.S., repeatedly sexually abused them in what should have been the safety of their own home, the guidelines do not take into account the father-daughter relationship that defendant and T.S. and L.S. shared. *Steanhouse*, 313 Mich App at 46 (stating that "the relationship between the victim and the aggressor[ ]" is a factor the guidelines do not take into account).

## B. PROPORTIONALITY OF DEFENDANT'S SENTENCES

As stated above, our guiding determination is whether defendant's sentences meet the principle of proportionality. *Steanhouse*, 500 Mich at 460. Specifically, we must decide if the "sentences imposed by the trial court [are] proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Id*. On this record, we are satisfied that the trial court "provide[d] adequate reasons for the extent of [defendant's] departure sentence[s]." *Id*. at 476. While the extent of the upward departures for both defendant's CSC I and CSC II sentences is significant, we agree with the trial court's competent and thorough assessment that the particularly disturbing facts of this case justify such departures. Over an approximately ten year period, defendant abused his position of trust as a beloved father figure to both T.S. and L.S. by repeatedly sexually abusing them in the sanctity of their own home. Particularly concerning is how defendant would wait for opportune times when the children were vulnerable because their mother was away at work. Defendant also used severe physical abuse to perpetuate the sexual abuse in an effort to control both T.S. and L.S. Additionally, T.S. and L.S. were subject to severe intimidation and coercion by defendant where they were not able to engage in social activities, have close friendships or any of the hallmarks of healthy childhoods, all in an effort to prevent them from disclosing the sexual abuse to others. As the trial court observed, this case is particularly disturbing where as a result of defendant's actions, the family unit has been obliterated, as L.S. and T.S.'s mother sided with defendant, and her relationship with her daughters has been broken as she has held her daughters out to be liars who have made up the sexual abuse allegations. Defendant's actions in violently sexually abusing T.S. and L.S., starting at the tender age of six, has left long-lasting psychological wounds and trauma that they were both still grappling with at the time of sentencing, and likely will into the future. Both T.S. and L.S. testified about their fractured family relationships, their loss of trust in people, including trusted family members, and their difficulty in navigating the world after being sexually abused. L.S. recounted cutting and burning herself intentionally and attempting suicide on at least one occasion. On this record, we agree with the trial court that the upward departure sentences are proportionate to (1) the seriousness of defendant's violent sexual offenses against young children and (2) defendant himself. *Steanhouse*, 500 Mich at 460.

However, we note that remand is necessary to allow for the trial court to correct the judgment of sentence to reflect that defendant's sentences run concurrently, as opposed to consecutively. Specifically, in our first opinion, we stated, in pertinent part, as follows:

> The prosecutor concedes that the trial court erroneously imposed consecutive sentences pursuant to MCL 750.520b(3). MCL 750.520b was amended in 2006 to allow for consecutive sentences in CSC cases such as this one. However, defendant's crimes were committed before the statute was amended. Thus, we agree with the prosecutor that, on remand, the trial court should amend defendant's judgment of sentence to reflect concurrent sentences. [*Zarn*, unpub op at 5 (footnote omitted).]

## III. CONCLUSION

-10-

We affirm defendant's sentences, but remand for the ministerial purpose of allowing the trial court to amend the judgment of sentence. We do not retain jurisdiction.

/s/ Kirsten Frank Kelly
/s/ Karen M. Fort Hood
/s/ Stephen L. Borrello