# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JASON CONRAD STREATER,

Defendant-Appellant.

UNPUBLISHED
July 3, 2018

No. 335670
Wayne Circuit Court
LC No. 16-004292-01-FC

Before: GLEICHER, P.J., and BOONSTRA and TUKEL, JJ.

GLEICHER, P.J. (*concurring in part and dissenting in part*).

I agree that defendant's torture conviction must be vacated and that defendant must be resentenced. The majority fails to mention that the sentences imposed for defendant's other convictions represent a substantial departure. Nor does the majority acknowledge that the trial court abused its discretion by failing to justify the departure and by expressly disavowing the guidelines entirely. Judge Vonda Evans' remarks persuade me that resentencing before a different judge is required to preserve the appearance of fairness and because the trial court is unlikely to set aside its strongly expressed views, especially absent any guidance from this Court.

I

Defendant advanced three issues on appeal, including that the trial court abused its discretion by imposing an unreasonable and disproportionate departure sentence. Other than remanding for resentencing consistent with *People v Steanhouse*, 500 Mich 453; 902 NW2d 327 (2017) (*Steanhouse II*), the majority entirely avoids this issue, ignoring that defendant has properly requested plenary review of his sentence. I am puzzled by the majority's reliance on the Supreme Court's opinion in *Steanhouse II* as a ground for remanding this case to the trial court without reasonableness review. *Steanhouse II* governs *appellate* review of departure sentences:

> We affirm the Court of Appeals' holding in *People v Steanhouse*, 313 Mich App 1; 880 NW2d 297 (2015) [*Steanhouse I*], that **the proper inquiry when reviewing a sentence for reasonableness** is whether the trial court abused its discretion by violating the "principle of proportionality" set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), "which requires sentences imposed by the trial court to be proportionate to the seriousness of the

- 1 -

circumstances surrounding the offense and the offender." [*Steanhouse II*, 500 Mich at 459-460 (emphasis added).]

*Steanhouse II* did not change any of the rules that applied to trial courts when defendant was sentenced; rather, the Supreme Court resolved how this Court should evaluate challenges to departures. Then as now, *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), applied to sentencing decisions in the trial court. Then as now, the proportionality approach set forth in this Court's opinion in *Steanhouse I* guided departure sentencing. By refusing to review defendant's sentence for reasonableness, the majority disregards *Steanhouse II* and otherwise kicks the can down the road, instructing the trial court to resentence defendant based on precisely the same legal principles that existed when the trial court imposed the initial departure sentence.

The majority's approach is reminiscent of the *Crosby* remand procedure adopted in *Steanhouse I* and jettisoned by the Supreme Court in *Steanhouse II*. In *Lockridge*, the Supreme Court adopted a remand procedure modeled on *United States v Crosby*, 397 F3d 103, 117-118 (CA 2, 2005). The Supreme Court limited *Crosby* remands to defendants whose guidelines minimum sentence range was constrained by a Sixth Amendment violation and who minimum sentences were not upward departures. *Lockridge*, 498 Mich at 395. Despite that the Supreme Court specifically exempted departure sentences from *Crosby* remands, this Court embraced *Crosby* in *Steanhouse I*, holding:

> While the *Lockridge* Court did not explicitly hold that the *Crosby* procedure applies under the circumstances of this case, we conclude that this is the proper remedy when, as in this case, the trial court was unaware of, and not expressly bound by, a reasonableness standard rooted in the *Milbourn* principle of proportionality at the time of sentencing. [*Steanhouse I*, 313 Mich App at 48.]

The Supreme Court reversed this aspect of *Steanhouse I*, stating quite plainly, "[T]he purpose for the *Crosby* remand is not present in cases involving departure sentences." *Steanhouse II*, 500 Mich at 476. The Supreme Court explained that "the panel in *Steanhouse* [*I*] should have reviewed the departure sentence for an abuse of discretion, i.e., engaged in reasonableness review for an abuse of discretion informed by the 'principle of proportionality' standard." *Id*. The Court remanded the case to this Court "to consider the reasonableness of the defendants' sentences under the standards set forth in this opinion." *Id*.

So why is the majority remanding this case for another sentencing hearing? In my view, the majority is doing precisely what the Supreme Court told us not to do in *Steanhouse II*. Our job is to review defendant's sentences for reasonableness. By dodging the merits of defendant's reasonableness argument the majority abrogates this important responsibility.[1]

---

[1] Nor does the majority explain why our decision to vacate defendant's torture conviction should play any role in the resentencing. The trial court sentenced defendant separately (although to the same terms of years) for each conviction. Vacating the torture conviction does not change the guidelines scores for the arson conviction.

As we are obligated by *Steanhouse II* to review defendant's departure sentences for reasonableness (and not punt this duty to the trial court), I will proceed to explain the trial court's errors and the reasons defendant should be resentenced by a different judge.

II

Before defendant was sentenced, the Department of Corrections (DOC) prepared a presentence investigation report (PSIR) and sentencing information report (SIR). The DOC scored several prior record variables—PRVs 1, 2, 5, and 7. At sentencing, defendant challenged these scores. The court ultimately eliminated the points assessed for PRVs 1, 2, and 5, leaving defendant with a total PRV score of 20 and placement within PRV Level C.

The DOC also assigned points for various offense variables. The DOC scored 20 points for OV 1 (aggravated use of a weapon), 15 points for OV 2 (lethal potential of the weapon used), 25 points for OV 3 (physical injury to a victim), 10 points for OV 4 (psychological injury to a victim), 25 points for OV 6 (intent to kill or injure a victim), and 50 points for OV 7 (aggravated physical abuse). Defendant's total OV score was 145 points, placing him in OV Level VI. A handwritten entry on the SIR indicates that defendant's guidelines range was 135 to 281 months' imprisonment.

The trial court acknowledged the minimum sentencing guidelines range, but instead sentenced defendant to 30 to 60 years imprisonment for the arson and assault with intent to commit murder convictions. Defendant's minimum sentence of 30 years (360 months) was 79 months (more than 6½ years) beyond the high end of the sentencing range. The court explained its sentencing decision as follows:

This case was horrific. It was the tale of two broken people trying to heal one another. [Defendant's] letter indicated that there was an alcohol issue, which I do believe they both suffered from. According to his letter, she had given him some type of communicable disease, I believe herpes, and he was upset about that, that she had gotten from a previous relationship. I don't know if that's true or whatever, but it may be.

But she, like so many women, wanted to be loved. And she looked for a man to complete her, instead of to compliment her. And what that did is . . . gave you the power to be the king of that home. In your letter, it says that you knew that . . . the daughter's father was not present in her life, and that: . . . "We had a very good relationship, and I was a good fit for her as well as her daughter. I was a good father figure, stepping in and doing the things her father didn't, and still taking care of my son in school."

What you understood is that - - you sized her up. You knew that she did not have a man, and the fact that you could come into your [sic] life, and that you were able to do that . . . because she was vulnerable. She was vulnerable in that she wanted a man to care for her.

Your insecurities led you to continually ask her whether or not she was cheating on you. You couldn't accept the fact that here's a woman who opened

her heart to you. Whether or not there was some type of exchange, or some type of disease, I don't know. But the point of it is . . . that even when she took the stand, she said: "We moved there together." And I could hear her voice, which was so damaged because of the trache that she had to receive, that . . . it was almost as if she was really happy during that time. You could hear it in her voice.

And what she thought was going to be a happy ending turned into a horrific ending. The only thing I can imagine is when her daughter said: "You know what? When I saw my mother, she was pink." How that had to impact her, to see her beautiful mother, hair gone, and her behind all pink. The scarring was horrific.

And that you then concocted a scheme to cause the smoke alarm to go off, to get her to come downstairs, and then to have gasoline in the can, and throw it in face, and light her on fire. What punishment? What could she have done that could have warranted her to be treated in that fashion? It was horrible.

See, she had the courage, after the incident, to do what she should have done before the incident, and that was to get rid of you. You're a monster.

\* \* \*

And you felt so bad about it that you went and stood in the same flames that you set for her to injure yourself, and to have some level of pity. And all she wanted from you was love.

See, a woman's greatest treasure, you know what it is? It's her family. And when she allowed her daughter to be around you, she gave all she had, because a real woman is not gonna' [sic] ever let you even come into contact with her child. But she trusted you. And you preyed upon her.

Here's a single woman, who doesn't have a male influence in her life, and "I'm gonna' come in, and I'm gonna' step up, and I'm gonna' run things [sic]." You even had the audacity, the audacity, to say something about settin' [sic] somebody on fire, or about: "Somebody's gonna' die [sic]," in front of her . . . cousin.

\* \* \*

[Y]ou might not have said it, but you set her on fire. That you did, okay? And then to summon someone down by making . . . the smoke detector come on? That was deliberate, that was intentional. And then to throw gasoline in her face and light her on fire? And all her daughter could hear was her mother screamin' and callin' her name [sic]. That's probably the last time she ever heard her mother's voice.

That little girl has to go on. That little girl is gonna' [sic] become a woman one day. And I hope to God that she doesn't run into a Jason Streater,

- 4 -

who she's looking to complete her, who she's looking for to give her love and the courage that she can only give herself. I hope that doesn't happen to that little girl.

But today is the day that you come to meet your fate.

*You know, one of the greatest things that [has] happened to many defendants is that there are now no guidelines. It used to be that there were guidelines. So, the Court has been able to sometimes do what it wants to do, . . .* to fashion a sentence that meets the crime, so that if I don't believe in what the prosecutor recommends, then I can, in my willingness, decide to not go with that.

Since that law has changed, I probably have gone beneath the guidelines many times, and fashioned a sentence that I believe, based on my twenty-plus years of being a judge and a prosecutor, of giving a sentence that will not only protect the community, but will also penalize the person that comes before me.

Today I'm challenged with different facts. [Emphasis added.]

The court proceeded to impose its upwardly departing sentences.

In rebuffing defendant's request for resentencing before a different judge, the majority asserts that the sentencing court "committed no error cognizable at this stage of the proceedings, nor has any finding or statement that she made been determined to be erroneous." Those statements are wrong.

Defendant was sentenced on September 22, 2016, more than a year after the Supreme Court decided *Lockridge*. In *Lockridge*, 498 Mich at 391, the Supreme Court made it abundantly clear that although the sentencing guidelines are advisory rather than mandatory, "they remain a highly relevant consideration in a trial court's exercise of sentencing discretion." The Supreme Court emphasized, "Sentencing courts must . . . continue to consult the applicable guidelines range and take it into account when imposing a sentence. Further, sentencing courts must justify the sentence imposed in order to facilitate appellate review." *Id.* at 392.

The trial court's statement, "You know, one of the greatest things that [has] happened to many defendants is that there are now no guidelines", directly contradicts *Lockridge*. The majority asserts that the court's deliberate disregard of *Lockridge*'s basic underlying premise was not error. I find this proposition preposterous.[2]

Defendant's sentencing also occurred almost a year after this Court issued *Steanhouse I*. *Steanhouse I* adopted the principle-of-proportionality test advanced in *People v Milbourn*, 435

---

[2] The majority justifies its remand by claiming that the trial court likely "misunderstood" *Lockridge*, or "inartful[ly] express[ed]" that the guidelines were no longer mandatory. I will not presume to read the trial court's mind. Our job is to review whether a departure sentence is reasonable by considering whether the trial court abused its discretion by violating the principle of proportionality described in *Milbourn*. The majority shirks that responsibility.

Mich 630; 461 NW2d 1 (1990). That test, *Steanhouse I* highlighted, "require[d] sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Steanhouse I*, 313 Mich App at 45, citing *Milbourn*, 435 Mich at 636. In *Milbourn*, 435 Mich at 653-654, the Supreme Court specifically renounced sentencing based on a trial court's feeling that it could do whatever it wanted:

> The trial court appropriately exercises the discretion left to it by the Legislature not by applying its own philosophy of sentencing, but by determining where, on the continuum from the least to the most serious situations, an individual case falls and by sentencing the offender in accordance with this determination.

The trial court was bound to follow *Lockridge* and *Steanhouse I* when it sentenced defendant. Instead, it boastfully disconnected its sentencing calculation from the guidelines, thereby contravening *Lockridge*, and imposed a sentence untethered to the *Milbourn* proportionality principles reaffirmed in *Steanhouse I*. In September 2016, *Lockridge*, *Steanhouse*, and *Milbourn* were not cutting-edge concepts. By disregarding these legal precepts to underplay (or shroud) the magnitude of the trial court's errors, the majority ensures that this case will return.

A common thread in the line of sentencing cases both before and after *Lockridge* is that a court may not depart from the guidelines range based on factors already taken into account by the guidelines unless the court articulates a legitimate reason for doing so. In determining whether the chosen departure sentence is more proportionate than a guidelines sentence, relevant considerations include: "(1) whether the guidelines accurately reflect the seriousness of the crime, . . . (2) factors not considered by the guidelines, . . . and (3) factors considered by the guidelines but given inadequate weight." *People v Dixon-Bey*, 321 Mich App 490, 525; ___ NW2d ___ (2017) (citations omitted). Although *Dixon-Bey* was decided after defendant was sentenced, this aspect of its holding summarizes well-established principles predating 2016.

Here, the trial court reasoned that an upward departure was warranted because (1) the case was horrific, (2) defendant sized Thomas up, exploited her vulnerability, and preyed upon her, (3) defendant concocted a scheme, lured Thomas downstairs, and set her on fire because defendant was insecure and sought to punish Thomas for alleged infidelity, (4) the potential impact the crime had on Thomas's daughter, and (5) defendant was a monster.

First-degree arson and assault with intent to commit murder are Class A offenses that are punishable by a maximum of life imprisonment. MCL 777.16c; MCL 777.16d. The guidelines provide a specific sentencing grid for that crime class. See MCL 777.62 (providing the minimum sentencing range for Class A crimes). Thus, the structure of the guidelines takes into account the seriousness of defendant's crime. See *People v Smith*, 482 Mich 292 at 311 n 42; 754 NW2d 284 (2008) (explaining that that a departure cannot be based solely on the heinousness of a particular type of crime because "the Legislature did not overlook this basis fact when establishing sentencing guidelines for [those] crimes").

The "horrific" nature of defendant's specific acts, as well as his "monstrous" behavior, were also taken into account in the scoring of several OVs. The scores for OVs 1 and 2 reflect that defendant used an "incendiary device," i.e. gasoline, in his assault against Thomas. See

- 6 -

MCL 777.31(1)(b), (3)(b); MCL 777.32(1)(b), (3)(d). Defendant's 25-point score for OV 3 reflected that he inflicted "[l]ife threatening or permanent incapacitating injury" on Thomas. MCL 777.33(1)(c). The assessment of 10 points for OV 4 was the highest possible to reflect the psychological injury caused to Thomas. MCL 777.34(1)(a). Defendant was assessed 25 points for OV 6, reflecting that he possessed a serious malicious intent—"unpremeditated intent to kill." Defendant's 50-point score for OV 7 reflected that he treated Thomas "with sadism, torture, excessive brutality, or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." The court did not explain why these scores were inadequate to measure the serious nature of defendant's offenses.

The *Milbourn* Court found that "departures from the guidelines, unsupported by reasons not adequately reflected in the guidelines variables, should . . . alert the appellate court to the possibility of a misclassification of the seriousness of a given crime by a given offender and a misuse of the . . . sentencing scheme." *Milbourn*, 435 Mich at 659. The Court explained:

> Where there is a departure from the sentencing guidelines, an appellate court's first inquiry should be whether the case involves circumstances *that are not adequately embodied within the variables used to score the guidelines*. A departure from the recommended range in the absence of factors not adequately reflected in the guidelines should alert the appellate court to the possibility that the trial court has violated the principle of proportionality and thus abused its sentencing discretion. Even where some departure appears to be appropriate, the extent of the departure (rather than the fact of the departure itself) may embody a violation of the principle of proportionality. . . . [*Id*. at 659-660 (emphasis added).]

The majority gives the trial court another chance to follow the law that was in effect at the time the original sentence was handed down. While I agree that resentencing is required, the trial court's rejection of the role of the guidelines and its brazen disregard for the procedural format governing the sentencing process convinces me that another judge must conduct the resentencing.

III

In evaluating whether resentencing should take place before a different judge, we consider:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness. [*People v Hill*, 221 Mich App 391, 398; 561 NW2d 862 (1997) (quotation marks and citations omitted).]

"A case should be assigned to a different judge if it would be unreasonable to expect the trial judge, given her handling of the matter, to be able to put previously expressed findings out of

mind without substantial difficulty." *People v Pillar*, 233 Mich App 267, 270-271; 590 NW2d 622 (1998).

The trial court expressed considerable anger and outrage about facts unrelated to the crime. The court spoke at length about the defendant's relationship with Thomas, which the trial court took pains to characterize as dysfunctional. In the court's view, defendant sought "the power to be the king of that home," and became involved with Thomas because "she was vulnerable and wanted a man to care for her." Thomas "wanted to be loved," the trial court observed, and "looked for a man to complete her, instead of to compliment her." According to the court the defendant "sized her up" and because the defendant himself was insecure, "couldn't accept the fact that here's a woman who opened her heart to you." The trial court's focus on this background information persuades me that its sentencing decision flowed from its perception that defendant wronged Thomas simply by being in a relationship with her. I find none of this relevant, and all of it outside the boundaries of proper sentencing considerations.

The trial court also made no effort to hide her view of defendant as "a monster," a "broken" person, and a predator. These forcefully expressed opinions suggest that it will be difficult for the court to objectively resentence defendant according to the proportionality principles, as one such principle requires a careful and even-handed evaluation of the offender's background. *Milbourn*, 435 Mich at 651.

The trial court also expressed outrage regarding the nature of the offense. Without question, defendant's crime was hideous. The victim sustained life-long, painful and disfiguring injuries. The Legislature anticipated hideous crimes and grievously injured victims and developed a guideline system designed to take into account the terrible things people do to each other. But the hideous nature of a crime must not blind us to a judge's violation of the rules of the law. Those rules require judges to focus on both the nature of the offense and any mitigating evidence factors involving the defendant himself. The trial court broke those rules.

Defendant had no history of violent crime and no juvenile record. He was employed at the time he committed the offenses. His prior convictions were primarily alcohol and drug related. He was 45 years old when he was sentenced. The judge considered none of these potentially mitigating facts. Instead, the trial court expressed that its job was to "giv[e] a sentence that will not only protect the community, but will also penalize the person that comes before me." This sentiment notably omits another essential component of every sentencing decision: rehabilitation.

I believe that resentencing before a different judge is warranted for two reasons. First, given the trial court's undisguised loathing of defendant, the court is unlikely to put aside its views and sentence him on a clean slate. Second, reassignment is necessary to preserve the appearance of justice. Defendant committed a terrible crime. But by calling defendant a "monster" and a predator the trial court has signaled that it finds him unworthy of the balanced consideration required by *Milbourn*. "The sentencing judge should appear as the fountainhead of justice, not the spirit of revenge." *Commonwealth v Spencer*, 344 Pa Super 380, 399; 496 A2d 1156 (1985) (SHOYER, J., concurring). Defendant committed a heinous crime. He is nevertheless entitled to sentencing by a judge whose impartiality will not be subject to further

debate. Defendant's resentencing should be conducted by a jurist proceeding under the rule of law, not a judge motivated by anger and disgust.

/s/ Elizabeth L. Gleicher